**Rocco DiLEO and Louise DiLeo, Plaintiffs–Appellants,**

v.

**ERNST & YOUNG, Defendant–Appellee.**

**Nos. 89–2027, 89–2183.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1990.

Decided May 7, 1990.

Rehearing and Rehearing En Banc Denied June 12, 1990.

Michael P. Myers, Joseph & Myers, Arthur T. Susman, Susman, Saunders &

Buehler, Richard H. Prins, Chicago, Ill., for plaintiffs-appellants.

Thomas D. Allen, Kathy P. Fox, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellee.

Before FLAUM, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Continental Illinois Bank's financial distress during the 1980s left many victims, from taxpayers (who injected some $2 billion to keep the bank afloat) to equity investors (who lost most of the value of their stock) to some of its officers (now spending time in prison) to bonding companies and insurers (which must compensate the firm for injuries caused by employees' delicts). Litigation was bound to erupt. Cases that have reached us include *FDIC v. Hartford Insurance Co.*, 877 F.2d 590 (7th Cir.1989); *In re National Union Fire Insurance Co.*, 839 F.2d 1226 (7th Cir.1988); *United States v. Patterson*, 827 F.2d 184 (7th Cir.1987); *FDIC v. O'Neil*, 809 F.2d 350 (7th Cir. 1987); *In re Continental Illinois Securities Litigation*, 732 F.2d 1302 (7th Cir. 1984).

Purchasers of Continental's securities filed suit against Continental, its officers and other employees, and those who helped it sell instruments, including lawyers, investment bankers, and accountants. Some of these suits have produced substantial judgments or settlements. Rocco and Louise DiLeo filed this case under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, as a class action against Ernst & Whinney (now Ernst & Young), Continental's accountant for the 1982 and 1983 fiscal years. The district court declined to certify the class, stating that it duplicated another suit that had been settled. It then dismissed the DiLeos' suit. The appeal concerns only securities fraud; other theories in the complaint have been dropped.

■ The rationale behind the judgment is obscure. This is the district judge's complete explanation:

> Judge Zagel found that plaintiffs in their original complaint alleged no facts to show E & W's recklessness or knowledge of falsity or intent to deceive. The first amended complaint does not correct this omission. The court finds that the plaintiffs have failed to plead scienter, have not pled facts to establish the elements of aiding and abetting by E & W, and have not pled with the specificity required by F.R.C.P. 9(b). Count I is dismissed with prejudice for the reasons set forth in E & W's briefs.

The parties did not favor us with Judge Zagel's opinion, and in any event the complaint grew after the initial dismissal. The additions could be important, and the court should have analyzed them. Circuit Rule 50, which requires a judge to give reasons for dismissing a complaint, serves three functions: to create the mental discipline that an obligation to state reasons produces, to assure the parties that the court has considered the important arguments, and to enable a reviewing court to know the reasons for the judgment. A reference to another judge's opinion at an earlier stage of the case, plus an unreasoned statement of legal conclusions, fulfils none of these.

■ The judge accepted the "reasons set forth in E & W's briefs" in the district court. Even if we had copies of these briefs (no one supplied them to us), they would be inadequate. A district judge could not photocopy a lawyer's brief and issue it as an opinion. Briefs are argumentative, partisan submissions. Judges should evaluate briefs and produce a neutral conclusion, not repeat an advocate's oratory. From time to time district judges extract portions of briefs and use them as the basis of opinions. We have disapproved this practice because it disguises the judge's reasons and portrays the court as an advocate's tool, even when the judge adds some words of his own. E.g., *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313–14 (7th Cir.1986); *In re X–Cel, Inc.*, 776 F.2d 130 (7th Cir.1985). Judicial adoption of an entire brief is worse. It withholds information about what arguments, in particular, the court found persuasive, and why it rejected contrary views. Unvarnished incorporation of a brief is a practice we hope to see no more.

■ Failure to state reasons for a decision ordinarily would lead to a remand. Yet the DiLeos do not request this step. Because the district court granted a motion under Fed.R.Civ.P. 9(b) and 12(b)(6), our review is plenary. A remand would prolong the case without contributing to accurate resolution. Because the complaint is fatally inadequate, we affirm the judgment in order to spare both the parties and the court gratuitous travail.

■ Plaintiffs advance two theories: that E & W violated the securities laws directly by certifying fraudulent financial statements that were incorporated into documents such as Continental's annual Form 10–K, and that E & W aided and abetted Continental's violations of the securities laws. Let us start with the first of these. Continental got into trouble when risky loans did not pay off. During the early 1980s Continental identified ever-larger volumes of nonperforming loans and established reserves. Almost every financial report announced a higher reserve than its predecessor. The gist of the DiLeos' complaint is that Continental did not increase its reserves fast enough. The central allegation of the complaint, ¶ 42(a), is that before the class members bought their stock E & W "became aware that a substantial amount of the receivables reported in Continental's financial statements were likely to be uncollectible." The complaint does not, however, give examples of problem loans that E & W should have caught, or explain how it did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate. Paragraph 46(c) is the closest the complaint approaches to specificity:

> (i) At Annual Report page 22, provisions for credit losses were stated at $492 million, which failed to reflect

the material amounts of credits for which reserves should have been taken, in additional amounts of at least $600 million.

(ii) At page 22, net credit losses of $393.2 million were materially understated by approximately $4 billion in bad loans.

(iii) At page 22, non-performing loans were reported at approximately $1.9 billion which materially understated the amount of loans which were not performing or which had been restructured to give the illusion that they were currently meeting obligations. . . .

The complaint has more in the same vein, but not a single concrete example.

Four billion dollars is a big number, but even a large column of big numbers need not add up to fraud. For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence. Recklessness or fraud in making loans is not the same as fraud in discovering and revealing that the portfolio has turned sour.

■ Securities laws do not guarantee sound business practices and do not protect investors against reverses. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir.1989). When a firm loses money in its business operations, investors feel the loss keenly. Shifting these losses from one group of investors to another does not diminish their amplitude, any more than rearranging the deck chairs on the Titanic prevents its sinking. Revealing the bad loans earlier might have helped the DiLeos, but it would have injured other investors by an equal amount. The net is a wash. Awards on account of business failure, even the expenses of litigation on the subject, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975), would discourage firms from taking risk in the first place. This would make investors as a whole worse off. Securities laws designed to protect investors' interests should not be read to increase the costs of ordinary business and so disserve their own ends. *Flamm v. Eberstadt*, 814 F.2d 1169, 1176–78 (7th Cir.1987).

Investors seeking relief under Rule 10b–5 have to distinguish their situation from that of many others who are adversely affected by business reverses. *Wielgos; Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99–100 (3d Cir. 1983). This complaint fails to do so. You cannot tell from reading it why the DiLeos believe that the problems were so apparent that reserves should have been jacked up before the end of 1983—why failure to increase the reserves amounted to "fraud". Fed.R.Civ.P. 9(b) requires the plaintiff to state "with particularity" any "circumstances constituting fraud". Although states of mind may be pleaded generally, the "circumstances" must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story. None of this appears in the complaint, although the flood of information released about Continental Bank since 1984 offers ample fodder if there is indeed a tale to tell.

The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud. *Goldberg v. Household Bank, f.s.b.*, 890 F.2d 965 (7th Cir.1989); *First Interstate Bank v. Chapman & Cutler*, 837 F.2d 775,

780 (7th Cir.1988); *Denny v. Barber*, 576 F.2d 465 (2d Cir.1978) (Friendly, J.). That ingredient is missing in the DiLeos' complaint. It presents nothing other than the change in the stated condition of the firm to suggest that E & W was so much as negligent in auditing Continental's financial statements. Rule 9(b) required the district court to dismiss the complaint, which discloses none of the circumstances that might separate fraud from the benefit of hindsight. There is no "fraud by hindsight", in Judge Friendly's felicitous phrase, *Denny*, 576 F.2d at 470, and hindsight is all the DiLeos offer.

■ We arrive at the DiLeos' second theory: that E & W aided and abetted Continental Bank's violation of the securities laws. The complaint gives more reason to suppose that some of Continental's employees committed securities fraud than that E & W did. As the DiLeos paint things, E & W assisted in the employees' scheme by lending its name to the financial statements and keeping its mouth shut about what was really going on. Such a theory might support liability even if none of the statements E & W made or certified was fraudulent.

As an original matter there is substantial doubt whether § 10(b) and Rule 10b–5 impose liability on those who do not themselves commit fraud but only assist others who do so. Daniel R. Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L.Rev. 80 (1981). Twice the Supreme Court has reserved the question. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 191 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976); *Herman & Maclean v. Huddleston*, 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983). Our court is the home of the leading case supporting liability for aiders and abettors, *Brennan v. Midwestern United Life Insurance Co.*, 259 F.Supp. 673 (N.D. Ind.1966) (Eschbach, J.), affirmed, 417 F.2d 147 (7th Cir.1969), and we stand by this conclusion until a higher court, not bound by our 20+ years' precedent, resolves it. E.g., *Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177, 183 (7th Cir.1986); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir.1986).

An accountant's liability for aiding and abetting is hard to distinguish from primary liability. After all, the securities laws forbid material omissions that render misleading what has been stated. When an accountant certifies that a firm's financial statements "present fairly" its financial position (the standard language of the profession), it is certifying the absence of materially misleading omissions, a source of primary liability. If it acts with the necessary mental state, the case for direct liability is complete. Liability for aiding and abetting as a *distinctive* theory then is something of an invitation to impose damages on an accountant even though the omissions were not material, or the accountant lacked scienter, or some other element of a violation was missing. We have accordingly been careful not to treat aiding and abetting as an open-ended invitation to create liability without fault. *Barker* holds, 797 F.2d at 495–97, and more recent cases reiterate, that there can be no liability on an aiding-and-abetting theory unless (1) someone committed a primary violation, (2) positive law obliges the abettor to disclose the truth, and (3) the abettor fails to do this, with the same degree of scienter necessary for the primary violation. E.g., *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 932 (7th Cir.1988); *Chapman & Cutler*, 837 F.2d at 780 & nn. 4, 5; *Congregation of the Passion*, 800 F.2d at 183–84. See also *Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir.1989). There may be additional requirements, *Barker*, 797 F.2d at 496, but we need not attempt a catalog.

Whether or not the complaint suffices to allege that someone at Continental Bank committed securities fraud, it utterly fails to allege duty and scienter on the part of E & W. The securities laws do not impose general duties to speak, *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 & n. 17, 108 S.Ct. 978, 987 & n. 17, 99 L.Ed.2d 194 (1988); therefore, as *Barker* held, these must usually be located in state law, if they exist at all. E & W performed its audit in Illinois, so its law is the right one to consult.

The DiLeos do not argue to us that Illinois requires accountants to blow the whistle on improper behavior by their clients. Although accountants must exercise care in giving opinions on the accuracy and adequacy of firms' financial statements, they owe no broader duty to search and sing. *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1327 (7th Cir.1989). Such a duty would prevent the client from reposing in the accountant the trust that is essential to an accurate audit. Firms would withhold documents, allow auditors to see but not copy, and otherwise emulate the CIA, if they feared that access might lead to destructive disclosure—for even an honest firm may fear that one of its accountant's many auditors would misunderstand the situation and ring the tocsin needlessly, with great loss to the firm. Duties to disclose or pay damages would raise the costs of all audits, as accountants increased fees to cover anticipated liabilities. Honest enterprises would pay these fees no less than dishonest (for until the audit ended, an accountant could not tell which was which). So firms would purchase less accounting service, and investors in all firms would lose at both ends: the price would go up as the amount of oversight went down.

Moreover, the complaint offers no reason to infer that E & W possessed the mental state necessary for a primary violation. Although Rule 9(b) does not require "particularity" with respect to the defendants' mental state, the complaint still must afford a basis for believing that plaintiffs could prove scienter. *Barker* observed, 797 F.2d at 497, that the case "against an aider, abettor, or conspirator may not rest on a bare inference that the defendant 'must have had' knowledge of the facts. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators." See also *Schlifke*, 866 F.2d at 948. The complaint does not allege that E & W had anything to gain from any fraud by Continental Bank. An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' au-

dits could not approach the losses E & W would suffer from a perception that it would muffle a client's fraud. And although the interests of E & W's partners and associates who worked on the Continental audits may have diverged from the firm's, see *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir.1990), covering up fraud and imposing large damages on the partnership will bring a halt to the most promising career. E & W's partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with Continental.

People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989); *Goldberg*, 890 F.2d at 967. The complaint does not come close. It does not identify any of E & W's auditors or explain what that person might have had to gain from covering up Continental's wrongs. It offers only rote conclusions, such as ¶ 61:

> E & W herein either had actual knowledge of the materially false and misleading nature of the statements and omissions set forth above, or acted with reckless disregard for the truth in failing to ascertain and disclose the material facts or aided and abetted the unlawful conduct alleged herein.

Boilerplate of this kind does not suffice. To accept it would undo the principles established in *Barker* and subsequent cases. What the DiLeos needed to show, if not that E & W had something to gain from deceit, was at least that E & W knew that particular loans had gone bad and could not be collected; an allegation that E & W joined with Continental in preparing the financial statements does not support an inference of scienter without knowledge of

this kind, which, as we have observed above, the complaint does not allege.

Because the DiLeos lose on the merits, we need not decide whether the district court properly dismissed the class aspects of their claim. If the dismissal was erroneous, the other members of the class would be brought into this case and join the DiLeos in defeat. If the dismissal was correct, the other members of the class will be unable to file a new suit (the statute of limitations has run), so again they cannot recover. One way or the other, the remaining investors are out of luck, so it is unnecessary to decide just which way.

AFFIRMED.