Gary STEINER, Kenneth Steiner, Norman Mermelstein, John Heller, Lepow Equities, Inc., Steven G. Cooperman, Jeanne Schaefer and Leonard Shapiro

v.

SHAWMUT NATIONAL CORP., Joel B. Alvord, John P. Hamill, and Gunnar S. Overstrom, Jr.

Civ. No. H–90–253 (AHN).

United States District Court,
D. Connecticut.

June 10, 1991.

Susan Peck, Hartford, Conn., Stephen Oestreich, Wolf, Popper, Ross, Wolf & Jones, Stephen R. Steinberg, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiffs.

Donn A. Randall, Hartford, Conn., Douglas M. Kraus, Skadden, Arps, Slate, Meagher & Flom, New York City, Thomas J. Groark and James Sicilian, Day, Berry and Howard, Hartford, Conn., for defendants.

## RULING ON MOTION TO DISMISS

NEVAS, District Judge.

In this four-count class and derivative action [1] brought against the defendants Shawmut National Corp. ("Shawmut"), Joel B. Alvord ("Alvord"),[2] John P. Hamill ("Hamill"),[3] and Gunnar S. Overstrom ("Overstrom") [4] for violations of the federal securities and common law, the plaintiffs allege that, in reports disseminated to the public between December 8, 1988 and March 21, 1990 ("the Class Period"), the defendants understated Shawmut's loan loss reserves, overstated its earnings, misrepresented the quality of its loan portfolio, and overestimated its future prospects. In count one, the class action plaintiffs [5] sue the defen-

---

**1.** The class action and derivative claims were consolidated by order of this court on May 8, 1990 (filing 13). At that time actions in the *district court of Massachusetts asserting claims* similar to those in the instant case were, by stipulation of the parties, withdrawn and dismissed.

**2.** Alvord is the director, President and Chief Executive Operating Officer of Shawmut National Corporation.

**3.** Hamill is Vice–Chairman of Shawmut National Corporation.

**4.** Overstrom is President and Chief Operating Officer of Shawmut National Corporation.

**5.** The class action plaintiffs, Gary Steiner, Kenneth Steiner, Norman Mermelstein, John Heller, Lepow Equities, Inc., Steven Cooperman, and Jeanne Schaefer, bring this action seeking class certification on behalf of all purchasers of

dants for securities fraud, alleging the violation of Sections 10(b) and 20 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. Section 240.10b–5, promulgated thereunder. In count two, the class action plaintiffs bring a pendent state law claim of negligent misrepresentation. In counts three and four, based on diversity [6] jurisdiction, the derivative plaintiff, Leonard Shapiro ("Shapiro"),[7] sues derivatively, on behalf of Shawmut, defendants Alvord and Overstrom, alleging in count three a state law claim of waste and mismanagement and in count four a state law claim of indemnification. Now pending is defendants' motion to dismiss (filing 41) counts one, two and four of the amended complaint for failure to state a claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P., and to dismiss counts two, three [8] and four for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1). For the reasons that follow, the defendants' motion to dismiss is denied in part and granted in part.

## I.

### A.

The Complaint sketches the following narrative. In February 1988, Shawmut Corporation ("SC") and Hartford National Corporation ("Hartford") merged to form Shawmut National Corporation.[9] In their introductory Letter to the Shareholders in Shawmut's 1988 Annual Report, the directors referred to 1988 as a year of "transition" in which the corporation refined its "focused business strategy, made progress toward established financial goals, and integrated certain businesses and operations ... [and] established a strong foundation, which will enable the Corporation to enter the 1990s with quality assets, strong capital and earnings momentum." Defendants' Reply Memorandum of Law in Further Support of Their Motion To Dismiss (filing 64) ("Defendants' Reply Memorandum"), Ex. A; Amended Complaint ("Am.Comp.") ¶ 27.

In the first three quarterly financial reports for 1989, Shawmut's reported earnings rose in comparison to the prior year's result. However, in a public announcement on January 23, 1990, earnings for the fourth quarter of 1989 were reported as down from $66.1 million reported in 1988 to $3.9 million, due to an increase in nonperforming loans of $146.3 million that led to a $139.4 million addition to the loan loss reserves. (Am.Comp. ¶ 42). Investors were told that the net results nevertheless amounted to a profit, with earnings for 1989 of $201.7 million. Alvord stated that Shawmut was confident of its ability to

---

6. Shawmut's common stock during the period December 8, 1988 through and including March 21, 1990.

6. In the memorandum to their motion to dismiss, defendants argued that ¶ 7 of the Amended Complaint failed to establish diversity jurisdiction because it alleged that the defendant Shapiro was a resident rather than a citizen of Massachusetts. Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action and Shareholders' Derivative Complaint (filing 42) ("Defendants' Memorandum"), at 35, citing *John Birch Soc'y v. Nat'l Broadcasting Co.*, 377 F.2d 194, 197–99 (2d Cir. 1967). However, with their Memorandum in Opposition, plaintiffs submitted a verification of Shapiro's Massachusetts citizenship. Appendix to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (filing 60) ("Plaintiff's Appendix"), Ex. 7. Thus, at oral argument on February 27, 1991, the defendants agreed that plaintiffs had established the requisite diversity. Transcript of Oral Argument, Feb. 27, 1991 (filing 69) ("Transcript"), at 5.

7. Shapiro purchased 200 shares of Shawmut Corporation common stock on July 27, 1987 and tendered his common stock in exchange for Shawmut National Corporation common stock pursuant to a joint proxy/prospectus dated October 7, 1989.

8. At oral argument on February 27, 1991, the defendants withdrew their motion to dismiss count three, since the plaintiff Shapiro had submitted an affidavit as to his Massachusetts citizenship, thus establishing the requisite diversity. Plaintiffs' Appendix, Ex. 7; Transcript, at 5.

9. Shawmut's principal banking subsidiaries are The Connecticut National Bank ("CNB"), which is itself a subsidiary of Hartford, and Shawmut Bank, N.A. ("SB"), which is itself a subsidiary of Shawmut Corporation. Shawmut is a regional interstate bank holding company, incorporated under the laws of Delaware, the shares of which are publicly traded on the New York Stock Exchange ("NYSE").

compete because of its "strong capital position, well-diversified loan portfolio, and tight control of expenses." (Am.Comp. ¶ 42). In an interview on January 25, 1990, Alvord commented that "New England is not Texas, and it's not going to be Texas." (Am.Comp. ¶ 43).

In February and March, 1990, 180 federal bank regulators (Am.Comp. ¶ 45) examined Shawmut's books.[10] Thereafter, on March 21, 1990, Shawmut acknowledged that greater portions of its loans were nonperforming than previously reported. The previously reported figure for nonperforming loans for 1989 was $535.6 million. After the federal examiners came, the figure for nonperforming loans rose by nearly 100% to $1.05 billion. The provision for loan loss reserves reported in the fourth quarter of 1989 as $139.4 million rose to $572.3 million, thus bringing the total loan loss reserve to $705 million, almost 45% higher than the figure reported in January, 1990. Whereas Shawmut had reported earnings for 1989 of $201.7 million, after the bank examination a loss was reported for 1989 of $128.9 million. Am.Comp. ¶ 46; Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (filing 60) ("Plaintiff's Memorandum"), at 11.

## B.

The plaintiffs allege that when SC and Hartford merged to form Shawmut in February, 1988, the new bank holding corporation adopted an aggressive lending policy, particularly in the high risk area of real estate development. At a time when the New England economy, and especially the real estate sector, had begun to deteriorate, the defendants allegedly misclassified loans in Shawmut's portfolio as performing and consequently underreserved for possible losses relating to those loans. (Am. Comp. ¶ 54). The plaintiffs allege that since additions to the loan loss reserves are charged against earnings, Shawmut's prac-

tice of underreserving for possible losses produced inflated financial results which, in turn, artificially boosted the price of the stock. Thus, the defendants "knowingly or recklessly" (Am.Comp. ¶¶ 49, 54, 56, 59, 60) deferred recognition of the extent of Shawmut's problem loans and failed to establish loan loss reserves which would have shown up in the financial statements as lower earnings. (Am.Comp. ¶ 49). In so doing, the defendants allegedly embarked on a "scheme" (Am.Comp. ¶¶ 24, 51) designed to "conceal" from investors "the true financial and operating condition of Shawmut." (Am.Comp. ¶¶ 53, 54). The plaintiffs allege that the defendants "ignored, hid, or disregarded" the impact the problem loans would have on Shawmut's financial condition (Am.Comp. ¶ 54) in order "to bolster" the reported earnings and net worth and "to enhance" the market price of the stock. (Am.Comp. ¶ 24).

The heart of the plaintiff's claims is contained in paragraph 52 of the Amended Complaint. There, the plaintiffs allege that the public information and reports[11] issued during the class period contained materially false and misleading information in that the defendants overstated the value of Shawmut's real estate and commercial loan portfolio (Am.Comp. ¶ 52(a)); that the allowance for nonperforming loans and investments was not maintained at an adequate level (Am.Comp. ¶ 52(b)); that management was inadequate to supervise and control properly the lending activities of the bank (Am.Comp. ¶ 52(c)); that the defendants understated nonperforming loans and failed to provide adequate loan loss reserves and instead granted extensions to problem loan customers (Am. Comp. ¶ 52(d)); that materially false and misleading projections were made about Shawmut's future profitability and successful performance (Am.Comp. ¶ 52(e)); that Shawmut's system of internal financial and accounting controls was materially defi-

---

**10.** The bank examination was conducted by the Office of the Comptroller of the Currency. Defendants claim that they invited the bank examiners to come in earlier than scheduled, thus indicating that they were not trying to conceal facts from public scrutiny. Am.Comp. ¶ 44.

**11.** The plaintiffs refer specifically to the 1988 annual report, the quarterly reports for 1989, and to Alvord's press release in January, 1990.

cient (Am.Comp. ¶ 52(f)); and that Shawmut's income, assets and net worth were materially and deceptively overstated (Am. Comp. ¶ 52(g)).

The plaintiffs thus allege that the defendants intentionally made the following misrepresentations: 1) that Shawmut managed its "highly-diversified" (Am.Comp. ¶¶ 28, 42) high quality loan portfolio "conservatively" (Am.Comp. ¶ 55(a)) and maintained "tight expense control" (Am.Comp. ¶ 55(c)); 2) that Shawmut's loan loss reserves were "adequate" (Am.Comp. ¶ 52(b)); 3) that Shawmut would continue to grow and be profitable (Am.Comp. ¶¶ 52(e), 53). The plaintiffs allege that the defendants' statements were materially false and misleading when made (Am.Comp. ¶ 49) "because the defendants materially understated Shawmut's requirements for loan loss reserves and consequently overstated Shawmut's reported earnings, assets and net worth." (Am.Comp. ¶ 49). Thus, the defendants allegedly knew that the statements were false at the time that they were made.

## C.

The defendants contend that these allegations, couched in the language of state law corporate mismanagement claims—the understatement of loan loss reserves, the inadequacy of supervision, the improper postponement of additions to the loan loss reserves, the rosy projections—are "all simply different sides of the same valuation coin," Defendants' Reply Memorandum, at 9–10, manifestations of mismanagement, perhaps, but not of fraud. They maintain that allowance for loan loss reserves is a matter of business judgment.[12] Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action and Shareholders' Derivative Complaint (filing 42) ("Defendants' Memorandum"), at 18. They argue that there were no intentional misstatements or omissions of material objective facts, and that if, in hindsight, the valuations made

were too high and the picture painted was too rosy, the defendants were merely guilty of puffing. *Naye v. Boyd*, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,979, 1986 WL 198 (W.D.Wash.), *aff'd*, 804 F.2d 146 (9th Cir.1986) (optimistic prognoses amounting to "obvious puffing" not actionable under federal securities laws); *see also Vt. Investors v. R & D Funding Corp.*, 733 F.Supp. 823, 837–38 (D.N.J. 1990) (prediction that investors would realize cash flow in excess of $60,000 per month "can only be characterized as 'puffery' because it is such an emphatic statement of opinion.")

More revealing, according to the defendants, is that the plaintiffs do not allege "that the reported figures did not accurately reflect the amounts actually calculated by the company and recorded on its books." Defendants' Reply Memorandum, at 6. The defendants argue that the plaintiffs have offered no alternative numbers which were the right figures at the time or any accounting standards that were violated. *Id.* at 8. According to the defendants, the gist of the complaint is that Shawmut's reserves were not increased fast enough, that its reserves were not high enough, that its loans were too risky—not that the defendants reported the wrong figures. *Id.* Indeed, the defendants point out that throughout the class period, "Shawmut repeatedly disclosed increases in its nonperforming loans and foreclosed properties.... Yet notwithstanding these disclosures, plaintiffs complain that they were misled as to Shawmut's business and financial condition." Defendants' Memorandum, at 12. The defendants contend that the plaintiffs have offered no facts to support their theory that the figures were intentionally misstated other than that the reserves went up in January, 1990 and again in March, 1990, after the bank examiners came. Thus, the plaintiffs charge the defendants "not for failing to disclose material facts, but instead for failing to disclose

---

12. The defendants maintain that "the 'value' of a loan portfolio depends on the levels of non-performing loans and loan loss reserves. These are not figures that can be determined by precise formulas; to the contrary, they are the results

of subjective judgments about general economic conditions, the condition of specific borrowers, the likelihood that they will repay their loans and the value of the collateral underlying those loans." Defendants' Memo, at 18–19.

defendants' alleged corporate mismanagement...." *Id.* at 14.

## II.

### A.

#### 1. *Fed.R.Civ.P. 12(b)(6)*

■ In considering a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted, a court is under a duty to determine whether the plaintiff has a valid claim under any possible theory. A motion to dismiss should not be granted "unless it appears beyond a doubt" that the plaintiff cannot support a claim entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The pleader, however, must set forth sufficient information to outline the elements of the claim or to permit inferences to be drawn that these elements exist. In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although a wide range of material may be taken into account. 5A C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1364, at 475–81 (1990).[13] For purposes of a motion to dismiss, the court must take the allegations of the complaint as true, *United States v. Mississippi,* 380 U.S. 128, 143, 85 S.Ct. 808, 816, 13 L.Ed.2d 717 (1965), and construe all reasonable inferences to be drawn from these facts in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

#### 2. *Fed.R.Civ.P. 9(b)*

■ Plaintiffs alleging fraud must plead with specificity the facts constituting this unlawful conduct. Rule 9(b), Fed.R. Civ.P., requires that "[i]n *all* averments of fraud ..., the circumstances constituting fraud ... *shall* be stated with particularity" (emphasis added).[14] There exists a tension between Rule 9(b) and the Rule 8(a)(2), Fed.R.Civ.P., requirement that pleadings consist only of "a short and plain statement of the claim showing that the pleader is entitled to relief...." Thus Rule 9(b) must be harmonized with Rule 8(a)(2). These rules are not mutually exclusive, however, and must be viewed in light of the policy considerations behind Rule 9(b). Three purposes underlie the particularity requirement of Rule 9(b):

> First, it assures the defendant of " 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Denny v. Barber,* 576 F.2d 465, 469 (2d Cir. 1978) (quoting *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444 (2d Cir.1971)).... Secondly, the specificity requirement grows out of "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing...." *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). In the context of securities litigation Rule 9(b) serves an additional important purpose. It operates to diminish the possibility that " 'a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* incre-

**13.** Plaintiffs suggest that defendants' citation to material outside the complaint such as newspaper articles should not be allowed in a motion to dismiss under Rule 12(b)(6). However, according to Wright and Miller:

> A wide range of material may be introduced in conjunction with a Rule 12(b) motion, subject, of course, to the court's discretion to reject the evidence if it feels that it is not substantial or comprehensive enough to facilitate the disposition of the action. Illustrative of the type of evidence that has been used on a Rule 12(b)(6) motion are the following: admissions of counsel, affidavits, answers to interrogatories, collective bargaining agree-

ments, contracts, copyrighted material, depositions, exhibits, hearsay, issues of a magazine, court judgments and orders, judicial notice of prior pleadings, leases, letters, oral arguments, prior pleadings, transcripts of prior court proceedings and matters of public record.

*Id.* at 475–81.

**14.** The use of the word "shall" is mandatory in statutory construction in the absence of any contrary intention expressed in the statute. C. Sands and N. Singer, 2A *Sutherland Stat. Const.* § 57.03—(4th Ed.1984), at 643–44.

ment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence....'" *Denny v. Barber, supra,* 576 F.2d at 470 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)). *Ross v. A.H. Robins, Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). What Rule 9(b) requires, in short, is a pleading that gives fair notice in light of the special nature of fraud cases.

In the instant case, the defendants do not request dismissal pursuant to Rule 9(b), Fed.R.Civ.P., because they agreed not to file a Rule 9(b) motion in exchange for plaintiffs' agreement not to sue the non-management directors.[15] "Plaintiffs' Appendix", Ex. 1. However, Rule 9(b) "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules," *Ross v. A.H. Robins Co.,* 607 F.2d at 557 (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1297 at 615 (1990), "derived from English common law practice," *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 99 (3rd Cir. 1983); *see also* 2A *Moore's Federal Practice,* ¶ 9.03 (1990), which "mandates," *Hurley v. FDIC,* 719 F.Supp. 27, 27 (D.Mass. 1989), that a claim of fraud be stated with particularity. The second circuit in particular has emphasized the need for a high degree of specificity in pleading securities fraud claims. *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972) ("[i]t is now quite clear in this Circuit that allegations with respect to 10b–5 violations will not pass scrutiny if they do not allege with some specificity the statements allegedly constituting the fraud. Mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of 10b–5 are insufficient.") (quoting *Matheson v. White Weld & Co.,* 53 F.R.D. 450, 452 (S.D.N.Y. 1971)). *See also Decker v. Massey–Fergu-*

son, Ltd., 681 F.2d 111, 114 (2d Cir.1982); *Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978).

Although motions to dismiss for failure to state a claim of fraud under SEC Rule 10b–5 have generally invoked Rules 9(b) and 12(b)(6), Fed.R.Civ.P., where, as here, defendants have requested dismissal of securities fraud claims under Rule 12(b)(6) without raising Rule 9(b), courts have nonetheless grounded their rulings on the Rule 9(b) requirement for specificity.[16] *See, e.g., Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971) (in affirming a district court's granting of a Fed.R.Civ.P. 12(b)(6) motion to dismiss, court cited Fed. R.Civ.P. 9(b) requirement that fraud be stated with particularity); *Kellman v. ICS, Inc.,* 447 F.2d 1305, 1309 (6th Cir.1971) (affirming a district court's granting of a Fed.R.Civ.P. 12(b)(6) motion to dismiss because plaintiffs failed to comply with Fed. R.Civ.P. 9(b)); *Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 308 n. 6 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971) (reversing district court's dismissal of complaint alleging securities fraud because complaint satisfied Fed.R.Civ.P. 9(b)); *Macario v. Pratt & Whitney, Canada, Inc.,* 1990 WL 200125, 1990 U.S. Dist. Lexis 16716 (E.D.N.Y. December 7, 1990) (granting Fed.R.Civ.P. 12(b)(6) motion to dismiss for plaintiff's failure to comply with Fed.R. Civ.P. 9(b)); *Goldberger v. Baker,* 442 F.Supp. 659, 668 (S.D.N.Y.1977) (in granting Fed.R.Civ.P. 12(b)(6) motion with leave to amend complaint, court cited Fed.R. Civ.P. 9(b) requirement that fraud be alleged with specificity); *Fox v. Prudent Resources Trust,* 382 F.Supp. 81, 94 (E.D.Pa. 1974) ("most courts which have recently considered the question have concluded that the requirements of F.R.C.P. 9(b) must be satisfied in a complaint alleging securities fraud."); *Bowman v. Hartig,* 334 F.Supp. 1323, 1328 (S.D.N.Y.1971) (dismiss-

---

**15.** This court is not bound by the agreements of the parties, as conceded by the plaintiffs at oral argument, Transcript, at 18–19, and will, therefore, in the absence of precedent to the contrary, apply Rule 9(b), Fed.R.Civ.P.

**16.** Rule 9(b), Fed.R.Civ.P., is silent concerning the need to file a motion, suggesting that 9(b) is a rule that applies regardless of whether a motion is filed.

ing Fed.R.Civ.P. 12(b)(6) securities fraud claim for failure to satisfy Fed.R.Civ.P. 9(b)); *Seward v. Hammond,* 8 F.R.D. 457, 458–9 (D.Mass.1948) (granting defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to comply with Fed.R.Civ.P. 9(b) requirement that fraud be alleged with specificity).

■ Thus, in this circuit, in order to withstand a motion to dismiss a securities fraud claim pursuant to Fed.R.Civ.P. 12(b)(6), complaints must allege sufficient facts to satisfy the specificity requirements of Fed.R.Civ.P. 9(b). The balancing exercise which Rule 9(b) requires of fraud plaintiffs can be a difficult one: pleadings must be specific, yet not evidentiary in nature. *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Although Rule 9(b) states that "malice, intent, knowledge, and other condition of mind of a person may be averred generally," plaintiffs are still required "to plead the factual basis which gives rise to a strong inference of fraudulent intent." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990).

### B.

■ The key issue at stake in this motion to dismiss is whether plaintiffs' allegation that the bank understated its loan loss reserves and thus overstated its earnings states a claim of fraud in violation of Section 10(b) of the 1934 Act [17] and Rule 10b–5.[18] Although Rule 10b–5 prohibits the use of deceptive and manipulative practices which lead to an investor's detrimental reliance, it provides no relief to those who believe that a corporation is mismanaged. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.") *See also Field v. Trump,* 850 F.2d 938, 948 (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Decker v. Massey–Ferguson,* 681 F.2d at 115; *Rodman v. Grant Found.,* 608 F.2d 64, 72 (2d Cir.1979). Thus, the question here is whether the defendants intentionally or recklessly understated the loan loss reserves in order to "deceive" investors, to manipulate the earnings reported so as to inflate the stock price. On the other hand, if this reporting was not intentional or reckless, but rather merely negligent, then a fraud action under the federal securities laws does not lie and the plaintiffs have failed to state a claim. *Santa Fe Indus., Inc. v. Green,* 430 U.S. at 472, 97 S.Ct. at 1300 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1384–85, 47 L.Ed.2d 668 (1976) (holding that cause of action under Rule 10b–5 does not lie for mere negligence)). The issue of whether the understatement of loan loss reserves constitutes fraud has, however, been addressed in only a few

---

**17.** Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**18.** Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990), provides:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

circuit court cases, none of which involved the current banking crisis.

### 1. *Circuit Court Cases*

As far back as the 1970s, the issue of loan loss reserves arose in the context of the litigation explosion involving real estate investment trusts ("REITs"). In *Denny v. Barber*, 576 F.2d 465 (2d Cir.1978) (Friendly, J.), the second circuit affirmed a district court's dismissal of a complaint pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., alleging fraud concerning loans made to REITs; foreign loans; inadequate loan loss reserves; alleged delays in writing off loans known to be uncollectible; risky and speculative investments in such entities as the State and City of New York; inadequate management policies which led to the overvaluation of the securities held by the defendant. As Judge Friendly opined:

> In sum, the complaint is an example of alleging *fraud by hindsight*. For the most part, plaintiff has simply seized upon disclosures made in *later* annual reports and alleged that they should have been made in *earlier* ones. While greater clairvoyance in 1973 might have led to a realization that foreign governments and enterprises might encounter difficulties, particularly in consequence of the dramatic increase in petroleum prices; that REITs ... would run into serious trouble ... and that New York City would come to the verge of bankruptcy late in that year, failure to make such perceptions does not constitute fraud.

*Id.* at 470 (emphasis added). As in the instant case, the plaintiffs in *Denny v. Barber* alleged that the bank's loans were "speculative and risky." However, the court noted that "the simple use of the epithet 'risky' is no better than a 'mere conclusory allegation that defendant's conduct was fraudulent,' *id.* at 469 (quoting *Segal v. Gordon*, 467 F.2d at 607, in turn quoting *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d at 444). The court added that "[n]ot every risky investment rises to the level of fraud because the risk is insufficiently disclosed." *Id.*

More recently, the issue was addressed by the seventh circuit in *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir.) (Easterbrook, J.), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Like the second circuit, the *DiLeo* court affirmed a district court's granting of a motion to dismiss pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P. The *DiLeo* case is distinguishable from the instant case in that there the defendant was an accounting firm and the case arose in the context of the bank problems of Continental Illinois in the early 1980s. Nevertheless, DiLeo, like the instant case, deals with the understatement of loan loss reserves. The complaint alleged that the defendants had materially understated the amount of loans which were nonperforming. As Judge Easterbrook explained:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, *plaintiffs may not proffer the different financial statements and rest*. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Id.* at 627 (emphasis added). Not only did the *DiLeo* court hold that the complaint failed to state a claim for fraud under Rule 10b–5; it suggested that a dispute which involved merely "the timing of the writeoff [of a bad loan], based on estimates of the probability that a particular debtor will pay," may not even amount to negligence. *Id.*

The third circuit also considered loan loss reserves in *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3rd Cir. 1983). There, however, the defendants' motion to dismiss was made pursuant to Fed.R.Civ.P. 9(b) rather than 12(b)(6). In *Christidis*, the complaint alleged that the defendants understated its loan loss re-

serves in its financial statements and misrepresented that the reserves were established in accordance with existing accounting principles and procedures. *Id.* at 98. The court found that the complaint's "defect" was

> the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices. Those reserves were estimates or predictions of the likely collection or liquidation experience of the Trust in the future. They could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.

*Id.* at 100. Thus, the second, third and seventh circuits, in cases involving the understatement of loan loss reserves, granted defendants' motions to dismiss because the complaints failed to allege securities fraud with the particularity required by Rule 9(b), Fed.R.Civ.P.

### 2. *District Court Cases*

In the last year many district courts have considered the issue of whether the understatement of loan loss reserves states a claim of securities fraud. While there have been decisions going both ways,[19] many courts have granted motions to dismiss complaints which merely point to additions to a bank's loan loss reserves as fraudulent. Although each court's examination of a complaint must be fact specific, the complaints in these cases allege similar factual

scenarios: 1) a substantial increase in the loan loss reserves 2) a substantial decrease in the value of the stock after the announcement of the increase 3) the inherent contradiction between the bank's statement that it was conservatively managed and the deterioration of its loan portfolio. The courts that have granted motions to dismiss have decided that the complaints at issue failed to allege facts that would support an inference of fraud.

Thus, in *Salit v. Centerbank,* 767 F.Supp. 429 (D.Conn.1990) (Burns, J.), the complaint alleged that the defendant Centerbank, in a series of public statements during the class period, misrepresented that its loan loss reserves were adequate and thus overstated the company's expected profitability. The court granted the defendants' motion to dismiss pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., because

> [p]laintiff's sole substantiation for his accusations is the *timing* of defendants' announcements. The plaintiff apparently maintains that the defendants must have been releasing misleading information as to their ability to pay dividends and meet loan losses, because the disclosure in January, 1990, of the refusal to pay dividends and the addition of about $40 million to loan loss reserves followed too closely the positive announcements in the last quarter of 1989.

*Id.* at 431. Judge Burns found, however, that the plaintiff gave "no particulars as to the respect in which he contends the statements are fraudulent and presents no basis for his belief that the defendants were

---

**19.** All the cases submitted to the court by the plaintiffs and the defendants involve motions to dismiss based on Rules 9(b) and 12(b)(6), Fed.R. Civ.P. *See, e.g.,* cases cited by the plaintiff denying motions to dismiss: *Balsam v. Eastchester Fin. Corp.,* Fed.Sec.L.Rep. (CCH) ¶ 95,877, 1991 WL 41901 (E.D.N.Y.1991); *Bramon v. Barnett Banks, Inc.,* No. 90–216–Civ–J–16 (M.D.Fla. Nov. 29, 1990); *In re Midlantic Corp. Shareholder Litigation,* 758 F.Supp. 226 (D.N.J.1990); *Save On Surplus Pension Plan v. United Saver's Bancorp., Inc.,* 760 F.Supp. 971 (D.N.H.1990); *Akerman v. Amoskeag Bank Shares,* No. C–90–119–L, 1990 U.S. Dist. Lexis 18798 (D.N.H. May 9, 1990); *Zinberg v. Washington Bancorp., Inc.,* No. 88–5174 (D.N.J. April 24, 1990).

*Contra* cases cited by defendants granting motions to dismiss: *Shields v. Amoskeag Bank Shares, Inc.,* 766 F.Supp. 32 (D.N.H.1991); *Heller v. NCNB Corp.,* 768 F.Supp. 167 (D.N.C.1991); *Dubowski v. Dominion Bankshares Corp.,* 763 F.Supp. 169 (W.D.Va.1991); *Haft v. Eastland Fin. Corp.,* 755 F.Supp. 1123 (D.R.I.1991); *Gollomp v. MNC Fin., Inc.,* 756 F.Supp. 228 (D.Md. 1991); *Wilkes v. Heritage Bancorp., Inc.,* Nos. 90–11151–F and 90–11285–F, 1990 WL 263612 (D.Mass. Nov. 21, 1990); *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11 (D.Mass.1990); *Salit v. Centerbank,* 767 F.Supp. 429 (D.Conn.1990).

engaging in fraud." *Id.* at 431. Similarly, in *Gollomp v. MNC Fin., Inc.*, 756 F.Supp. 228 (D.Md.1991), the plaintiffs alleged that the defendant's announcement of a substantial increase in its loan loss reserves in April, 1990 followed reports of artificially inflated earnings in its financial statements for 1988 and 1989. The *Gollomp* court held that "[n]one of these facts are sufficient to support the conclusory averments that defendants acted fraudulently, i.e., that they did something more than mismanage the affairs of the bank or err in projecting the performance of its loans." *Id.* at 231. In *Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123 (D.R.I.1991), the complaint contained similar facts in that defendants announced a dramatic increase in nonperforming loans and a correspondingly dramatic decrease in earnings. There, the court found that the complaint failed to show how any of the statements made were untrue, *id.* at 1128–29, and that "the how of this complaint is so general that [it] ... might apply to any financial institution in the Northeast." *Id.* at 1128. The court held that "[f]ailing to disclose possible mismanagement or incompetence does not state a federal securities law claim." *Id.* at 1131 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. at 477–78, 97 S.Ct. at 1302–03). Most recently, in *Shields v. Amoskeag Bank Shares, Inc.*, 766 F.Supp. 32 (D.N.H.1991), the court noted that "[m]ost courts recently faced with strikingly similar complaints have concluded that these allegations amount to corporate mismanagement and poor business judgment in coping with the general economic downturn, rather than fraud." 766 F.Supp. at 38. The *Shields* court pointed to "a flood of securities fraud class actions," *id.*, which have been filed in the first circuit since the New Hampshire district court's decisions in *Save on Surplus v. United Savings Bancorp.*, 760 F.Supp. 971 (D.N.H. Oct. 24, 1990) and *Akerman v. Amoskeag Bank Shares*, No. C–90–119–L, 1990 U.S.Dist. Lexis 18798 (D.N.H. May 9, 1990), *see* cases cited *supra* note 19. In declining to follow the two New Hampshire cases denying motions to dismiss, the *Shields* court agreed "with the wisdom of the majority," 766

F.Supp. 38, and found that such allegations are "so general that they could be filed against any financial institution in New England" and therefore "without more, do not amount to 'fraud.'" *Id.*

### C.

#### I. *Count One*

##### A. Rule 10b–5

■ In the instant case, the complaint fails to supply sufficient facts to support an inference that the defendants intentionally understated the loan loss reserves in order to overstate earnings. Nor are there facts to support the allegation that defendants knew or should have known that the figures reported did not accurately reflect the large numbers of bad loans. As in *Salit v. Centerbank*, the plaintiffs' sole substantiation for their allegations is the timing of defendants' announcements, the discrepancy between the figures reported in 1989 and the figures disclosed in January, 1990 and in March, 1990, after the bank examination. Yet, as held by the *Salit* court, the fact that the reserves increased is not enough to state a claim of securities fraud. As the court in *DiLeo* explained, the plaintiff must point in the complaint to some reason that the difference between the "rosy" projections and later results is attributable to fraud. "[T]he circumstances [of the fraud] must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." 901 F.2d at 627. Here, as in *DiLeo*, the "how" of the deception is missing, the circumstances under which the defendants intentionally understated the loan loss reserves so as to make the earnings appear higher; and "why failure to increase the reserves amounted to 'fraud.'" *Id.* Although there is no question that the plaintiffs here have identified the alleged misrepresentations, yet "the complaint alleges only in a most sketchy fashion circumstances which would give rise to an inference of fraud." *Ross v. A.H. Robins*, 607 F.2d at 558. As the court

found in *Heller v. NCNB Corp.*, 768 F.Supp. 167 (D.N.C.1991):

[t]he complaint basically recites a series of financial reports, press releases and other information available to the public and then alleges that these were all false and misleading and were made with knowledge or reckless disregard of their false nature or misleading qualities. The complaint falls far short of providing an adequate factual basis for an inference of fraud and scienter.

*Id.* at 169.

Similarly, the plaintiffs allege that the bank's real estate loans were risky and should have been written off earlier, which would have resulted in additions to the loan loss reserve. Yet, as in *Denny v. Barber*, "there is no specification of what loans, at what times, and in what amounts were 'risky.'" 576 F.2d at 469. "In the absence of such particulars, and given the myriad of ... loans made by the Bank ..., the simple use of the epithet 'risky' is no better than a 'mere conclusory allegation to the effect that defendant's conduct was fraudulent,' which we have held to be insufficient." *Id.* Indeed, "there ... must be more than vague allegations that, as shown by subsequent developments, the corporation's true financial picture was not so bright in some respects as its annual reports had painted and that the defendants knew, or were reckless in failing to know, this." *Id.* at 470. Here, as in *Denny v. Barber, DiLeo, Salit, Gollomp, Haft,* and *Shields,* the complaint lacks the specificity to satisfy Fed.R.Civ.P. 9(b) and thus fails to state a SEC Rule 10b–5 securities fraud claim under Fed.R.Civ.P. 12(b)(6).

**B. Section 20**

▮▮▮ In addition to the Rule 10b–5 securities fraud claim contained in count one, the primary violation, the plaintiffs also allege that the defendants were "control persons of Shawmut," (Am.Comp. ¶ 59(c)),

aiders and abettors who engaged in the schemes, transactions, and artifices to defraud described in the Rule 10b–5 claim. This additional claim for secondary liability must fail, however, if the primary violation claim is dismissed. *Bosio v. Norbay Sec., Inc.*, 599 F.Supp. 1563, 1568 (E.D.N.Y. 1985). Since this court has dismissed the plaintiffs' Rule 10b–5 claim, the section 20 claim is also dismissed.

**II. Count Two**

▮▮▮▮ In count two, the class action plaintiffs allege the pendent state law claim of negligent misrepresentation. However, count two fails to state a claim for negligent misrepresentation under either Connecticut or Massachusetts law,[20] both of which require privity or actual knowledge by the defendants of reliance to state a claim for negligent misrepresentation. *In re Coleco Sec. Litigation*, 591 F.Supp. 1488, 1491–94 (S.D.N.Y.1984) (no claim for negligent misrepresentation under Connecticut or New York law absent fiduciary duty, privity, or a bond so close as to approach privity) (citing *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.) (no duty to unknown prospective investors for negligent (as opposed to fraudulent) misrepresentation under New York law)); *Hurlev v. FDIC*, 719 F.Supp. 27, 34 (D.Mass.1989) ("In Massachusetts, the tort of negligent misrepresentation requires privity ..."). In the instant case, the class action plaintiffs allege that the defendants owed a duty to all purchasers of Shawmut stock within the class period, (Am.Comp. ¶ 14), prospective investors to whom the defendants owed no duty and whose reliance could not have been known by the defendants. Thus the state law claim for negligent misrepresentation in count two is dismissed for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).[21]

---

**20.** The plaintiffs argue that Massachusetts law controls this cause of action; defendants believe Connecticut law should be applied. This court need not address the question as to whether Massachusetts or Connecticut law applies because both states require privity or reliance to state a negligent misrepresentation claim.

**21.** This court's jurisdiction over count two was premised solely on the doctrine of pendent jurisdiction. *See generally United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16

**1248**

### III. *Count Four*

 In count four of the Amended Complaint, the derivative plaintiff, Shapiro, alleges on behalf of Shawmut the derivative state law claim of indemnification. This claim for indemnity must fail, however, if the class action claims in counts one and two are dismissed. Since Shawmut is a defendant with potential liability in only the first two counts, and therefore cannot be liable for damages in the derivative claim of mismanagement in count three, the indemnity claim is contingent upon the success of the class action plaintiffs in counts one and two. Since the court has dismissed the class action claims in counts one and two, the derivative claim for indemnification is dismissed without prejudice to renewal.

### *Conclusion*

For the foregoing reasons, this court finds that the complaint fails to state a claim of securities fraud with sufficient specificity to satisfy Rules 9(b) and 12(b)(6), Fed.R.Civ.P. The defendants' motion to dismiss the class action claims in count one is, therefore, granted. The plaintiffs are granted leave to amend their complaint within 30 days. The motion to dismiss the class action claim in count two for negligent misrepresentation is granted for failure to state a claim pursuant to Fed.R. Civ.P. 12(b)(6). Since at oral argument on February 27, 1991, the defendants withdrew their motion to dismiss the derivative claim in count three, the motion to dismiss count three, pursuant to Fed.R.Civ.P. 12(b)(1), is denied as moot. The motion to dismiss the derivative claim in count four

for indemnification is granted without prejudice to renewal.

SO ORDERED.

---

L.Ed.2d 218 (1966). Under this doctrine, a federal court has jurisdiction over an entire action, including state law claims, "whenever the federal-law claims and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (quoting *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139). When, however, the federal claims are dismissed before trial, the state claims should usually be dismissed as well. *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138; *Carnegie–Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619

n. 7. In 28 U.S.C. § 1367, the Judicial Improvements Act of 1990 (applying to civil actions commenced after Dec. 1, 1990), Congress codified the above rule, providing in § 1367(c)(3) that the district court may decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." In the instant case, the federal securities claims in count one have been dismissed. However, this court need not dismiss count two for lack of subject matter jurisdiction since plaintiffs have failed to state a claim for negligent misrepresentation. Thus, count two must be dismissed regardless of whether the federal claims are dismissed.