James G. MONROE and Penelope E. Monroe, individually and on behalf of similarly situated persons, Plaintiffs,

v.

Gary C. HUGHES, Thomas R. Hudson, and Deloitte & Touche fka Deloitte, Haskins & Sells, Defendants.

DELOITTE & TOUCHE, Cross–Claimant,

v.

Gary C. HUGHES, and Hughes Homes, a Washington corporation; Cross–Defendants.

Civ. No. 90–152–MA.

United States District Court, D. Oregon.

Dec. 9, 1991.

Henry Kantor, Keith E. Tichenor, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, OR, for plaintiffs.

Milo Petranovich, Lane Powell Spears Lubersky, Portland, OR, Philip Rotner, Karen Kennard, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for defendant Deloitte & Touche.

Jay Zulauf, J. David Stahl, Mundt MacGregor Happel Falconer Zulauf & Hall,

Seattle, WA, for defendant Thomas R. Hudson.

## OPINION

MARSH, District Judge.

Plaintiffs filed this action seeking damages for alleged violations of federal and state securities laws against two principals of the now defunct Hughes Homes, Inc. and Deloitte & Touche, an independent auditor, arising out of their purchase of debentures in 1989. Defendant Deloitte & Touche (hereinafter "defendant") now moves for summary judgment against all claims. For the reasons that follow, defendant's motion for summary judgment is granted.

## BACKGROUND

In April, 1989, plaintiffs purchased 14 units of Hughes Homes debentures and warrants. Hughes' common stock was actively traded on the NASD National Market System. In their complaint, plaintiffs allege that Hughes Homes, and its independent accounting firm, Deloitte & Touche, issued documents which contained material misstatements and omissions about the financial condition of Hughes in violation of Section 10(b) and Rule 10b-5 of the federal Securities Exchange Act of 1934 and O.R.S. 59.115 and 59.135 of Oregon's Blue Sky Laws. In addition, plaintiffs allege that Hughes filed a registration statement which contained false and misleading financial data in violation of Section 11 and Section 15 of the 1933 Securities Act.[1] Finally, plaintiffs argue that when Deloitte re-issued its audit in April of 1989, it failed to disclose its findings to the group of underwriters working on the offering.

On November 19, 1990 a hearing was held on Deloitte's motion to dismiss for failure to state a claim and plaintiffs' motion for class certification. I denied defendant's motion to dismiss, but cautioned plaintiffs that, as I read the allegations in their complaint against Deloitte, they, at best, might support a claim for negligence. However, at the hearing, plaintiffs proffered additional evidence to bolster their claims that Deloitte may have been "reckless" under Rule 10b-5 standards by failing to discover faulty internal controls, failing to report that discovery and failing to ensure that management made efforts to correct those conditions. Transcript, pp. 9–10. Based upon plaintiffs' proffer, I denied the motion.

On April 5, 1991 I granted plaintiffs' motion for class certification with some hesitancy given the disclosure that plaintiff had entered into an "agreement" with the underwriter, Paulson Investments. On September 12, 1991, Deloitte's cross-claims against Paulson and the participating underwriters were dismissed without prejudice by stipulation.

## STANDARDS

Summary judgment is appropriate if the court finds that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). There is no genuine issue of material fact where the nonmoving party fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989).

All reasonable doubts as to the existence of genuine issues of fact must be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). The inference drawn from underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inference may be drawn, summary judgment is inappropriate. *Sankovich v. Insurance Co. of North America,* 638 F.2d 136, 140 (9th Cir. 1981).

---

1. Section 11 creates strict liability against anyone who signs a registration statement containing false or misleading information (subsection (a)(1)) and every accountant who prepares and certifies any part of a registration statement (subsection (a)(4)). Section 15 imposes liability for false registration information upon anyone deemed to be a "control person."

## DISCUSSION

Defendant's motion raises numerous alternative grounds upon which summary judgment could be based, and in the alternative, seeks decertification of the class on grounds that plaintiffs cannot show reliance and are not entitled to a presumption of reliance. Both defendant's motion for summary judgment and plaintiffs' response raise a number of difficult issues in the securities' law field which are complex and not easily answered.[2]

However, I see one critical flaw in plaintiffs' case against defendant which goes straight to the heart of all of their claims—as I read their allegations, plaintiffs fail to identify a single misrepresentation or omission in defendant's 1988–89 audit reports.[3] Each material "omission" plaintiffs allege is identified by defendant in letters that Deloitte sent to management.[4] Plaintiff characterizes these letters as "smoking guns." Yet, the letters demonstrate that defendant *did* its job—i.e. it did not "recklessly disregard" evidence of inadequate internal controls. Deloitte noted several weaknesses in Hughes' internal controls and reported those weaknesses to management along with suggestions for improvement. Therefore, plaintiffs fail to identify and do not rely upon any material misstatements or omissions within the text of the audit or prospectus.[5] Thus, as I see it, the critical issues in this case are neither reliance nor scienter, but: (1) whether Deloitte had a duty to disclose its findings to investors or the underwriters—either directly or by "qualifying" its report; and (2) whether Deloitte recklessly determined that the internal control problems were "reportable conditions" rather than "material weaknesses" which should have triggered a going concern qualification.

### a. *Duty to Disclose*

■ As I noted in *Schnitzer v. Kronenburg*, Civ. No. 90–204–MA (Opinion filed Aug. 28, 1990), the securities laws are only violated when there is a duty to disclose.

---

**2.** For example, plaintiffs seek to invoke the presumption of reliance described by the Supreme Court in *Affiliated Ute v. U.S.*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), on the basis that this case involves both omissions and misrepresentations. It is unclear whether the Affiliated Ute presumption is applicable outside of the fiduciary context and whether it applies to so-called "mixed" cases which involve both misrepresentations and omissions.

In addition, plaintiffs invoke the fraud on the market presumption of reliance. It is an unsettled question in the Ninth Circuit as to whether this presumption may be applied to a newly issued security such as the debentures at issue in this case based upon a "well developed" market for common stock.

**3.** In their complaint, plaintiffs allege that financial statements in the registration statement and prospectus were "inaccurate, false and misleading" because defendants:

1. "failed to disclose the inadequacy of Hughes Homes' internal controls and accounting systems to generate financial statements of Hughes Homes as a going concern, specifically as to recognition of revenue, doubtful receivables, inventory and floor plan financing arrangements (due to overstated inventory serving as collateral);
2. overstated the value of receivable and inventory;
3. misrepresented that provisions for doubtful receivables were not material;
4. failed to disclose that the unaudited financial statements for the six months ending December 31, 1988 were not reliable; and
5. failed to disclose that DH & S had reviewed the unaudited financial statements and that these financial statements were not reliable."

First Amended Complaint, Paragraph 32.

Alleged misrepresentations # 2 through 5 are merely restatements of # 1—in essence, plaintiffs allege that defendant should not have conducted its audit in reliance upon Hughes' financial statements.

**4.** *See* Plaintiff's Response to Defendant's Interrogatory # 1. Plaintiffs were asked to identify every misrepresentation or omission for which Deloitte is liable. Plaintiffs recite the internal problems identified in Deloitte's May 11, 1988 Management Letter, June 30, 1988 "Risk Assessment," and September 9, 1988 Management Letter.

**5.** I note that plaintiffs' reliance upon the allegations that Deloitte failed to qualify its report and their failure to identify a misstatement or omission in the audit, may itself be fatal. *See In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir.1991), *amended* at slip op. 15525 (filed Dec. 6, 1991) (affirming a district court grant of summary judgment where plaintiff failed to demonstrate that any statement made by a company defendant was false or misleading and failed to produce any evidence to show that underwriter defendants knew of additional facts they failed to reveal in their research reports).

Op. at 4–5, *citing Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 653–4 (9th Cir.1989), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989) and *Jett v. Sunderman,* 840 F.2d 1487, 1492 (9th Cir. 1988). The securities laws do not impose general duties to speak. *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.) *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

■ The scope of the duty owed by attorneys and accountants hired by investment principals is limited to those areas that lie within the matter for which the professional is retained. *See e.g. Roberts,* 857 F.2d at 654 (law firm hired to determine marketability of title owed no duty to investors to disclose that title was transferred from interested party at inflated price); *In re Worlds of Wonder Securities Litigation,* 721 F.Supp. 1140, 1146 (N.D.Cal.1989) (accountants may be liable for alleged misrepresentations and omissions in prospectus prepared by them, but not for general statements issued by corporate officials); and *Schnitzer,* Op. at 6–8 (attorney owed no duty to disclose risks inherent in *any* oil drilling operation). Although accountants must exercise care in reviewing financial statements, they generally owe "no broader duty to search and sing (since) such a duty would prevent the client from reposing in the accountant the trust essential to an accurate audit." *DiLeo,* 901 F.2d at 628–29.

■ Further, as noted by the court in *In re Wyse Technology Security Litigation,* C–89–1822, Daily Appellate Report at 12741, 1990 WL 169149 (N.D.Cal. filed Sept. 13, 1990), the fact that alleged misstatements and omissions went undetected in an audit does not, standing alone, give rise to an inference of fraud by an auditor. *Wyse,* at 12742. In *Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335, 1340 (9th Cir.1980) the court upheld a summary judgment in favor of defendants where Rule 10b–5 claims against an accounting firm were based solely upon the

allegation that the audit was not sufficiently thorough. The court held that such an allegation, at best, gave rise to a claim for negligence, but failed to establish the "quality of intent required for a violation." *Id.,* at 1341–42. Thus, although it is clear that accountants may be liable for alleged misrepresentations and omissions in prospectus and registration statements prepared by them or which bore their name, *see In re Worlds of Wonder Securities Litigation,* 721 F.Supp. 1140, 1146 (N.D.Cal.1989), liability for securities fraud does not apply to actions in which only ordinary negligence is plead. Although compliance with auditing standards will not immunize an auditor from all liability, compliance or non-compliance with regulations may be helpful in determining the issue of "recklessness." *See Matter of Hawaii Corp.,* 567 F.Supp. 609 (D.Hawaii 1983).[6]

■ Thus, primary liability may not be established against collateral participants, such as accountants and attorneys, in the absence of a duty to disclose material information allegedly withheld. *See Roberts,* 857 F.2d at 653; *Camp v. Dema,* 948 F.2d 455, 463 (8th Cir.1991) (lawyers do not have a duty to "tattle" on their clients in the absence of a duty, such as a fiduciary relationship); *Schatz v. Rosenberg,* 943 F.2d 485 (4th Cir.1991) (law firm's ethical duty of disclosure does not create corresponding legal duty under federal securities laws).

■ However, a collateral participant may nevertheless be found liable for a violation if, under the circumstances of an individual case, the facts give rise to a duty to disclose. *Roberts,* 857 F.2d at 653; *Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1330–31 (8th Cir.1991). The court determines whether a defendant owes duty of disclosure by examining the following non-exclusive factors:

(1) defendant's relationship to the plaintiff;

(2) defendant's access to information as compared to plaintiff's access;

---

6. In *Hawaii Corp.,* the trustee in bankruptcy sought to recover damages from Peat Marwick in connection with a failed reorganization plan under federal and state securities laws, as well as common law negligence, malpractice and breach of contract theories. Judge Panner found that alleged errors in accounting work were insufficient to state a claim under the securities' laws, but considered Peat Marwick's compliance with GAAP and GAAS for the purposes of assessing liability under plaintiff's common law negligence and malpractice claims.

(3) any benefit defendant derives from it relationship with plaintiff;

(4) defendant's awareness of plaintiff's reliance; and

(5) defendant's activity in initiating the securities transaction in question.

*Id.*, at 653–54. In addition, the Eighth and Eleventh Circuits have also considered: (6) the extent of the defendant's knowledge; (7) the significance of the non-disclosure; and (8) the extent of the defendant's participation in the fraud. *Reves*, 937 F.2d 1310, 1330 *citing Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987).

■ As to Deloitte's duty to disclose the information to the shareholders or underwriters, defendant has submitted AICPA standards in effect at the time Deloitte conducted the 1988 audit. These standards reveal that, in general, an auditor's review of "internal controls" has a limited purpose— the auditor reviews the controls to determine the *scope* of the audit—i.e. poor internal controls is a signal to conduct a more thorough audit, whereas good controls signal a less searching audit. *See,* Section 320 of AICPA. In addition, these standards note that consulting with management regarding perceived deficiencies in internal controls is an "increasing trend," *not* a requirement. There is nothing in the professional standards to indicate that an independent auditor owes any duty of disclosure to investors.

Further, the undisputed evidence is that Deloitte's auditors orally reported conditions to members of Hughes' audit committee immediately following the audit, and followed up their oral findings with a written report dated September 9, 1988. Pursuant to AU § 321–25, Deloitte's report includes a statement that the communication is intended "solely for the information and the use of the audit committee, management and others within the organization." Deloitte's letter of September 9, 1988 reiterates this limitation. In addition, defendant has come forward with the affidavit of Mike Brown, a Deloitte accountant, who recalls meeting with a "working group" which included Hughes Directors and members of the underwriters group in early 1989. Brown indicates that he mentioned the internal control problems at one of these meetings and that no one ever pursued the issue with him. There is no evidence that any underwriter sought information from Deloitte which was not provided and the underwriters never requested comfort from Deloitte. *See* Affidavit of John Leness (although present at meetings leading up to offering, he is unable to recall what, if anything, Brown said about internal controls and does not recall ever asking for a copy of the 1988 management letter).

It is undisputed that Deloitte was asked to conduct a general audit, and was not engaged to report on Hughes Homes' internal accounting controls. It is also undisputed that Deloitte looked at the internal controls, identified deficiencies and adjusted the scope of its audit accordingly. Deloitte summarized its criticisms of the controls and communicated its concerns orally to management immediately following the completion of the audit. In September of 1988, Deloitte memorialized its findings regarding the control in a letter to management. Management requested time to prepare a formal response, and the letter was never included as part of the registration statement. Management completed its response and made the letter public two months after the offering in 1989.

In a letter to underwriters dated April 19, 1989, Deloitte stated that it had made "inquiries of responsible Hughes Homes' officials" and that "there was no reason to believe that these financial statements did not comply with the applicable accounting requirements of the Securities Act." *Id.,* at paragraph 22. Plaintiffs allege that Deloitte "recklessly" failed to follow-up on its recommendations when it re-issued its audit in 1989 to determine if management had in fact improved the internal controls. However, the professional standards regarding reissuance of an audit report only require the auditor to do two things: (1) read the prospectus and (2) inquire of management regarding whether any events have occurred which might have a material effect on the audited financial statements. Thus, auditors are not "police" as plaintiffs suggest, and under professional

standards, were not required to ensure that Hughes corrected internal control problems prior to its re-issuance of the audit report.

On February 10, 1990, Hughes Homes issued a press release describing its financial difficulties. Included within this release was Hughes' disclosure that Deloitte:

> "had indicated that any report on the 1989 financial statement would likely include a disclaimer of opinion due to Hughes Homes' possible inability to continue as a going concern and lack of supporting documentation to explain significant year-end adjustments resulting from deficiencies in its internal control and accounting system."

The fact that Hughes chose not to disclose the deficiencies until ten months after registration may give rise to an inference of fraud with respect to Hughes, but says nothing of the auditor. Deloitte's disclosure and disclaimer of opinion are evidence that it was not a participant in any alleged fraud. There is nothing in the record to imply that Deloitte had any direct interest in the transaction. There was simply no motive and nothing for Deloitte to gain from participating in a "cover-up." Finally, under current auditing standards, Deloitte would have violated a duty to its client if it had done what plaintiff suggests and publicly disclosed information about the internal control weaknesses prior to giving management a full opportunity to respond.

Based upon the foregoing, I find that plaintiff has failed to produce any evidence to demonstrate that Deloitte owed a duty to disclose internal control problems to anyone but the management of Hughes Homes. The undisputed evidence is that Deloitte did disclose the problems to the Directors of Hughes in a timely and complete fashion. Finally, plaintiff has produced no evidence which would tend to show that Deloitte was an "insider" or acted in any capacity other than that of an independent auditor so as to give rise to a "fiduciary" duty under the *Roberts* analysis.

b. *Reportable Conditions v. Material Weaknesses*

■ Defendant contends that it followed accepted accounting procedures by identifying problems with internal controls and conveying these "reportable conditions" to management. Plaintiffs' expert, Dennis Pixton, says that, in his professional judgment, the internal control problems identified by Deloitte constituted "material weaknesses," which should have caused Deloitte to "qualify" its audit report.[7] Pixton is unable to identify any other alleged breach of professional standards—for example, he does not allege, as plaintiff's counsel did at our hearing of November 19, 1990, that Deloitte "recklessly disregarded its obligation to find these things out."

Section 340 of the AICPA professional standards provides that an auditor may presume an entity's continued existence. A continued existence analysis focusses upon "an entity's ability to continue to meet its obligations as they become due." Section 340.04 provides examples of "contrary information" which may lead an auditor to conclude that the presumption of continued existence is inaccurate. These include such things as negative cash flows, loan defaults, loss in key management, legal proceedings and uninsured natural catastrophes. Poor internal control are not in the list of identified factors which should lead an accountant to consider qualifying her report. Internal control problems are addressed in an entirely different section and, according to AICPA standards, trigger concerns about an entity's ability to accurately record progress and summarize financial date, but do not trigger concerns about an entity's continued existence.

However, even if poor internal controls were a recognized basis to trigger an auditor to find an entity's continued existence was threatened, AU 340.13 notes that "identifying the point at which uncertainties about recoverability, classifications and amounts require the auditor to modify his report is a complex

---

**7.** Two important things to keep in mind about Pixton's affidavit: (1) Pixton's affidavit is the *only* document plaintiffs cite in support of their "Concise Statement of Material Disputed Facts;" and (2) Pixton *relies* upon Deloitte's own work papers to draw his conclusion that, in his judgment, the problems identified constitute "material weaknesses."

professional judgment. No single factor or combination for factors is controlling."

The 1989 professional standards which plaintiffs submitted along with a second affidavit from Dennis Pixton and a sur-reply following the November argument do not alter my conclusion. Whether I look at the standards in effect at the time of the audit, or at the standards in effect just following the audit, there is nothing in either set of professional standards which indicates that poor internal controls should be used as a factor in determining whether to include a going concern qualification within the audit. AU § 341.06 (1989). Further, the 1989 standards include the same caution that an auditor must first obtain mitigating information from management before *any* qualification is appropriate. AU § 341.07. The standards also emphasize that *any* going concern qualification is discretionary with the auditor. *See* AU § 341.12, n. 4 ("Nothing in this section ... is intended to preclude an auditor from declining to express an opinion in cases involving uncertainties.")

As the complaint now stands, plaintiffs have, at best, alleged facts which might support a claim of professional malpractice if this were a shareholder derivative suit or a malpractice claim filed on behalf of Hughes. However, a difference of professional opinion as to whether the audit should have included a going concern qualification falls far short of liability for securities fraud, and fails to satisfy the standards for Section 11 liability since such a professional difference of opinion cannot be said to constitute a "misstatement" or material omission for the purposes of establishing liability under the securities laws.

## CONCLUSION

A difference of professional opinion as to whether Deloitte's *judgment* that the problems it identified constituted "reportable conditions" or "material weaknesses," fails to satisfy a claim for securities fraud, even with the Ninth Circuit's adoption of "recklessness" as a form of scienter.[8] Plaintiffs have had over a year of discovery and have failed come forward with any evidence to demonstrate that Deloitte misrepresented any material facts, or omitted any material information from its audit—either negligently, recklessly or intentionally. Further, since I find that plaintiffs have failed to identify any material misrepresentations or omissions, they have failed to raise a genuine issue even under the strict liability provision of § 11 or the Oregon Securities laws.

Based on the foregoing, I find that plaintiffs have failed to show that Deloitte owed a duty to disclose its findings of internal control problems to anyone but management, and that it fulfilled this duty. Accordingly, defendant's motion for summary judgment against all claims is granted.

---

8. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that mere negligence was insufficient to support a claim for damages under Rule 10b–5. The Court required plaintiffs to prove some degree of scienter or some intent to deceive or manipulate. In a footnote, the Court qualified its holding by explaining that "scienter refers to a mental state embracing intent to deceive, manipulate or defraud. In certain areas of the law, recklessness is considered to be a form of intentional conduct for the purposes of imposing liability for some act." However, the Court found that it "need not address" the issue of whether recklessness will suffice for civil liability under Rule 10b–5. *Id,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12.

The Ninth Circuit has held that recklessness may satisfy the element of scienter in a civil action for damages under 10b–5. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990). While noting that past decisions have failed to delineate the contours of what "recklessness" means and have actually approached negligence, the court held that, at least in the context of omissions, "recklessness" should be defined as: "a highly unreasonable omission, involving not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care." *Id.*