**In re URCARCO SECURITIES LITIGATION.**

**Civ. A. No. 3:90–CV–1737–X.**

United States District Court,
N.D. Texas,
Dallas Division.

May 18, 1993.

Wilmer Dallam Masterson, III, Theodore Carl Anderson, Kilgore & Kilgore, Dallas, TX, Eugene A. Spector, Paul J. Scarlato, Office of Eugene A. Spector & Associates, Sherrie R. Savett, Robert Frutkin, Karen Orman, Arthur Stock, Berger & Montague, Philadelphia, PA, Nita Fandra, Office of Alfred Yates, Jr. & Associates, Pittsburgh, PA, Howard J. Sedran, Levin Fishbein Sedran & Berman, Philadelphia, PA, David Jaroslawicz, Office of David Jaroslawicz, Jeffrey H. Squire, Kaufman Malchman Kaufman & Kirby, Daniel L. Berger, Rochelle Feder Hansen, Bernstein Litowitz Berger & Grossman, New York City, Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Pittsburgh, PA, for plaintiffs.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

NOW before the Court are Underwriters' Motion to Reconsider Their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, filed on March 26, 1993, Defendants' Motion to Reconsider Their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, filed on March 23, 1993, and Defendant Coopers & Lybrand's Motion to Reconsider Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, filed on March 29. Having considered these filed materials as well as having reconsidered the motions, responses and replies regarding the motions to dismiss, and having considered the arguments of counsel presented at the hearing held on March 30, 1993, the Court determines that the defendants' motions should be, and hereby are, **GRANTED.**

This action results from the consolidation of four separately filed lawsuits, in which Plaintiffs seek recovery for alleged securities fraud arising out of two securities offerings, an initial public offering (IPO) and a secondary public offering (SPO), of the used car

retailer Urcarco. Plaintiffs level their aim at several groups of defendants: the individual defendants, consisting of persons who were officers and directors of Urcarco; Urcarco, Inc.; Coopers & Lybrand, Urcarco's independent auditor; and three securities underwriters, Merrill, Lynch, Pierce, Fenner & Smith, Inc., Alex. Brown & Sons, Inc. and Cazenove, Inc. Plaintiffs seek to represent a class of investors who were allegedly defrauded by the concerted bad acts of this litany of wrong-doers, and have among their ranks one of the unluckiest and most victimized investors in the history of the securities business, one Mr. Steven G. Cooperman, who spends a good deal of his time being a plaintiff in class action securities fraud suits.[1] In addition to a plaintiff class, Plaintiffs seek the certification of a defendant class of all underwriters named in the SPO prospectus, a class of over *fifty* firms, which Merrill Lynch, Alex. Brown and Cazenove are supposed to represent. In rejoinder, the defendants allege that Plaintiffs, after repleading twice, still fail to allege fraud with particularity as the Federal Rules of Civil Procedure require. *See* FED.R.CIV.P. 9(b).

Urcarco operates a chain of used car lots in Forth Worth, Dallas, Houston and Austin, Texas. Having begun operation in 1987, the company specializes in selling used cars and light trucks and providing installment financing to purchasers who might otherwise find difficulty financing such a purchase. Urcarco decided to go public, and in November of 1989, conducted its IPO. On May 31, 1990, the company made its second securities offering. Plaintiffs' factual theory is simple although its complaint is prolix: Defendants made positive statements concerning present and future conditions of Urcarco in the IPO and SPO prospectuses, in SEC filings and in a WALL STREET JOURNAL "Heard on the Street" column when the truth was otherwise and the defendants either knew or recklessly disregarded that truth.[2] According to Plaintiffs, the truth remained concealed until a negative article concerning Urcarco appeared on June 3, 1990, in NEWSDAY, entitled "Kick the Tires and Out Comes Hot Air," and another in FORBES called "It's Legal, But is it Smart?" came out on June 25, 1990. Consequently, Urcarco's stock price declined from a high of 25½ in April of 1990, to the mid-teens in July of that year. This downward turn precipitated the four securities fraud suits filed in July and August of 1990, which are consolidated herein.

Plaintiffs' consolidated, amended class action complaint, filed on December 6, 1991, contains eight counts. Count I asserts a cause of action against all defendants for a violation of Section 11 of the Securities Act of 1933. Count II finds Urcarco, Merrill Lynch, Alex. Brown, Cazenove and the SPO defendant class in the cross hairs of Section 12(2) of the '33 Act. Count III is against the individual defendants for alleged violations of Section 15 of the Securities Act. Count IV alleges a cause of action against all defendants for supposedly violating Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5 promulgated thereunder. An allegation arising under Section 20(a) of the Exchange Act against the individual defendants rounds out Count V, while all defendants are

---

**1.** It was represented to the Court at the March 30, 1993, hearing, without contravention, that Mr. Cooperman admitted in sworn interrogatories that he has been a plaintiff in thirty-eight class action securities fraud cases. The Court's research revealed his involvement in at least the following *reported* decisions: *In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489 (N.D.Cal.1992) (Cooperman is represented in *Toolworks* by the same counsel as in this case); *First City Fin. Corp. v. Armstrong World Indus., Inc.,* CIV. A. No. 89–4858, 1990 WL 10089 (E.D.Pa. Feb. 2, 1990) (Cooperman represented by same counsel as in this case); *Ferber v. Travelers Corp.,* 785 F.Supp. 1101 (D.Conn.1991); *In re One Bancorp Sec. Litig.,* 136 F.R.D. 526 (D.Me. 1991); *Cooperman v. Powell,* CIV. No. 91–37–

FR(LEAD), 1991 WL 57010 (D.Or. April 9, 1991); *In re Fairfield Communities, Inc.,* No. LR–M–91–160, 1992 WL 158642 (E.D.Ark. April 14, 1992); *Steiner v. Shawmut Nat'l Corp.,* 766 F.Supp. 1236 (D.Conn.1991).

**2.** *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference *must* be attributable to fraud.") (affirming dismissal on Rule 9(b) grounds) (emphasis added).

accused of state law negligent misrepresentation in Count VI. All defendants are called to task in Count VII for an alleged violation of Section 27.01 of the Texas Business & Commerce Code concerning fraud in a stock transaction, and last, but certainly not least, all defendants are accused of common law fraud in Count VIII. The Federal Rules of Civil Procedure provide that, "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FED.R.CIV.P. 9(b). Although the Court recognizes that the application of Rule 9(b) to securities fraud cases has been criticized,[3] the United States Court of Appeals for the Fifth Circuit has placed its *imprimatur* on such application. *Whalen v. Carter,* 954 F.2d 1087 (5th Cir.1992); *Dennis v. General Imaging, Inc.,* 918 F.2d 496, 499 (5th Cir.1990); *Smith v. Ayres,* 845 F.2d 1360 (5th Cir.1988). Rule 9(b) serves three purposes: First, the Rule ensures that defendants receive fair notice of the plaintiffs' claims; second, it protects the defendants' reputations from unfounded allegations of improper conduct, and third, the Rule helps prevent the institution of strike suits.[4] *Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.,* 794 F.Supp. 1265, 1280 (S.D.N.Y.1992); *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir. 1992). The Rule seeks to prohibit a plaintiff, or plaintiff's firm, from watching the market for a security's value to plummet, filing suit the next day and then later trying to discover something to call a fraudulent basis for the security's decline in value. *See Lopez v. Bulova Watch Co.,* 582 F.Supp. 755 (D.R.I. 1984).[5]

The United States Supreme Court has endorsed a theme in securities jurisprudence counseling against the allowance of such vexatious litigation over "many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony." *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, ——, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 743, 95 S.Ct. 1917, 1929, 44 L.Ed.2d 539 (1975)). In *Blue Chip Stamps,* the Court adopted a rule requiring that a plaintiff be either a purchaser or seller of securities giving rise to the claim in order to have standing to sue under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 promulgated thereunder. By adopting this rule, the Court severed three types of plaintiffs from a possible remedy: 1) potential purchasers of securities, 2) actual shareholders who elected not to sell because of an "unduly rosy representation or a failure to disclose unfavorable material," and 3) "shareholders, creditors and ... others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or

---

**3.** *See Stevens v. Vowell,* 343 F.2d 374, 389 n. 3 (10th Cir.1965) (In a Section 10(b) and Rule 10b–5 context, the court stated that "Rule 9(b) requiring the pleading of fraud with particularity, is not applicable in this case, even assuming that the question was properly raised below."); *accord Rochambeau v. Brent Exploration, Inc.,* 79 F.R.D. 381 (D.Colo.1978), *SEC v. Platt,* 565 F.Supp. 1244 (W.D.Okla.1983). However, the Tenth Circuit appears to have abrogated its 1965 perspective on Rule 9(b). *See Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982 (10th Cir.1992) (affirming the dismissal of the plaintiffs' claims against Peat, Marwick for failure to allege fraud with particularity).

**4.** Such suits have also been termed "blackmail suits." *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975). Other courts have likewise expressed concern over strike suits. *See, e.g., Segal v. Gordon,* 467 F.2d 602, 607 (2d

Cir.1972); *In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1452 (N.D.Ill.1991); *Coronet Ins. Co. v. Seyfarth,* 665 F.Supp. 661, 665–66 (N.D.Ill.1987).

**5.** That court stated as follows:

Fraud is different than ordinary notice pleading. In run-of-the-mill cases, the rules of pleading allow a party to discover a claim after filing. The very purpose of Rule 9(b), however, runs to the contrary. In cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action. The mandate for that specificity is a product of "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing...."

*Id.* at 766 (quoting *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972)).

sale of securities which violate Rule 10b–5." *Blue Chip Stamps*, 421 U.S. at 738, 95 S.Ct. at 1926. The Court determined that, although these three types of plaintiffs might have real injuries occasioned by genuine wrongful conduct, the unfairness of a rule denying them a 10b–5 remedy must be subordinated to the countervailing advantages of such a rule in a 10b–5 suit, a context giving rise to the "widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.* at 739, 95 S.Ct. at 1927. The Court explained that such potential for vexation rests on two grounds:

> The first of these concerns is that in the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment. The very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit.

*Id.* at 740, 95 S.Ct. at 1927.

The Court's second concern revolved around discovery wars, and is worth quoting at length:

> The potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation. The prospect of extensive deposition of the defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents, is a common occurrence in this and similar types of litigation. To the extent that this process eventually produces relevant evidence which is useful in determining the merits of the claims asserted by the parties, it

bears the imprimatur of those Rules and of the many cases liberally interpreting them. But to the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.

*Id.* at 741, 95 S.Ct. at 1928.

The Court continued the theme in a 1991 decision concerning the ambit of the word "facts" in a materiality analysis[6] and the issue of causation as it related to a cause of action under Section 14(a) of the Exchange Act and SEC Rule 14a–9, which relate to fraud in the proxy context. In *Virginia Bankshares v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Court considered the issue of whether "statements of reasons, opinions, or beliefs are statements 'with respect to ... material fact[s]' so as to fall within the strictures of the Rule." *Id.* —— U.S. at ——, 111 S.Ct. at 2757. Having concluded that such statements could be material, the Court made the policy concerns of *Blue Chip Stamps*, outlined above, the touchstone by which its analysis proceeded. Such statements could be factual in two regards: as statements that the directors act for reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed. *Id.* —— U.S. at ——, 111 S.Ct. at 2758. The Court therefore determined that attacks on the truth of directors' statements of reasons or belief assailed factual underpinnings for those beliefs and would therefore not be based on a plaintiff's purely subjective hypothesis that fraud had occurred. Such a suit would not implicate the threat of vexatious litigation feared in *Blue Chip Stamps*.

However, the Court was careful in its analysis to spare the lower courts from nuisance litigation that could otherwise spring from suits driven by plaintiff subjectivity and

---

**6.** Rule 14a–9, 17 C.F.R. § 240.14a–9, prohibits proxy solicitations containing affirmative statements or omissions that are false or misleading with respect to any *material fact*. Regarding the standard for materiality, *see TSC Indus., Inc. v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

based on statements of reasons, opinions or beliefs:

> [T]o recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize § 14(a) litigation confined solely to what one skeptical court spoke of as the "impurities" of a director's "unclean heart." This, we think, would cross the line that *Blue Chip Stamps* sought to draw. While it is true that the liability, if recognized, would rest on an actual, not hypothetical, psychological fact, the temptation to rest an otherwise nonexistent § 14(a) action on psychological enquiry alone would threaten just the sort of strike suites and attrition by discovery that *Blue Chip Stamps* sought to discourage.

*Id.* —— U.S. at ——, 111 S.Ct. at 2760 (citation omitted). Thus the Court again recognizes the tension between allowing a remedy to plaintiffs with real injuries—liability resting on *actual,* not *hypothetical* facts—or discouraging potentially bogus suits in which plaintiffs might lay siege to a group of defendants through discovery and just see which side lasts longer; the Court, continuing a consistent pattern, determined that the latter should be privileged over the former.

The Supreme Court's concerns with securities suits that have a shaky basis—if they have a basis at all—and for which summary judgment or other summary disposition is usually practically unavailable, have found support in empirical evidence. For instance, Professor Janet Cooper Alexander studied a group of securities fraud class actions arising out of IPO situations and concluded that, contrary to received notions of settlement behavior suggesting that settlements are voluntarily negotiated outcomes acceptable to the parties and legitimated by the parties' consent, "a significant and identifiable class of settlements is in reality neither voluntary nor accurate. These settlements are not voluntary in that trial is not regarded by the parties as a practically available alternative for resolving the dispute, and they are not accurate in that the strength of the case on the merits has little or nothing to do with determining the amount of the settlement."

Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan.L.Rev. 497, 499 (1991). Professor Alexander concludes that a number of factors provide for the truth of her hypothesis, including unusually risk averse defendants, exponentially high potential damages and insurance contract provisions that make large sums of money, not paid directly by the parties, available for negotiated settlements but not for judgments after trial. She notes that these types of cases resist disposition on the merits short of trial "because critical substantive elements of the claims—issues such as materiality, due diligence, and scienter—are of the sort that procedural rules have traditionally deemed unsuitable for summary adjudication." *Id.* at 524. These conclusions compel the inference, which inheres in the rationale of Rule 9(b) and the Supreme Court's concerns in *Blue Chip Stamps,* that securities class actions present an unusual potential for abusive litigation; a court should therefore navigate an assiduously close course to Rule 9(b), which guides this Court in the following analysis.

 Pleading with particularity means stating circumstances in detail. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Although the Rule allows states of mind to be pleaded generally, circumstances giving rise to the generality must also appear in detail. *Id.* In other words, plaintiffs must plead a factual foundation for otherwise conclusory allegations of scienter, and the facts must give rise to a strong inference of the requisite intent. *Bank of Montreal v. Bresner,* No. 92 Civ. 0875 (MBM), 1992 WL 296438, at *2 (S.D.N.Y. Oct. 8, 1992).

 Plaintiffs' consolidated, amended class action complaint fails to state fraud with particularity and to plead a factual foundation for what are otherwise bare conclusions regarding the defendants' states of mind. One wonders how a pleading, the textual portion of which covers seventy-four pages, could use so many words yet say so little that is really firmly, factually grounded. The complaint begins with a conclusory, three

page "nature of the case" statement, which flows into a portion dealing with jurisdiction, venue and parties that lasts another seven pages. Thereafter, the complaint offers a section regarding "conspiracy, aiding and abetting and concerted action allegations," which, as much of the complaint, is characterized by rote repetition of buzzwords taken from the pertinent statutes and rules. Thus one arrives at Plaintiffs' class action allegations on the bottom of page eighteen, and this portion of the complaint, which deals with Rule 23, FED.R.CIV.P., issues—not facts having anything to do with allegations of fraud—continues to page twenty-two, at which one is promised information concerning "Defendants' Wrongful Course of Conduct."

But no. Instead, Plaintiffs continue the complaint's initial practice of repeating buzzwords and making general conclusions—"defendants, and each of them, engaged in a course of conduct which was designed to and did deceive the investing public...." One then receives a lesson in "The Used Car Retail Industry in General" and Urcarco's business practices, after which Plaintiffs sample liberally from the IPO prospectus, simply quoting block passages and, with the help of 20–20 hindsight, trying to put the right spin on the quotations. Pages not reserved for quotation from the IPO prospectus are given to paraphrase, which Plaintiffs likewise attempt to cue with favorable English. The same repeat-and-spin tactic finds application to the SPO prospectus, to SEC filed documents and to the newspaper and magazine articles that allegedly flattened Urcarco's tires.[7] One begins to understand how the length of seventy-four pages can belie its own potential for specificity.

Throughout the complaint, Plaintiffs repeatedly refer to facts "particularized" in paragraphs eighty-six through eighty-nine, and if anything could be characterized as the "factual" heart of the complaint, this 5½ page portion is it. Paragraph eighty-six continues the repeat-and-spin strategy, noting that de-

fendants portrayed themselves in public statements as knowledgeable about the used car and financing industry, and portrayed Urcarco as a company that would "legitimize a mistrusted industry." Rule 9(b)'s guiding particularities—who, what, when, where and how—do not exist in paragraph eighty-six's conceptual structure.

Paragraph eighty-seven, which contains several subparts, is longer than its allegedly specific sequential predecessor. Plaintiffs are here concerned, among other things, that Urcarco financed 100% of *many* of its sales, accepted *many* down payments in the form of trade-ins for which the value ascribed was *significantly* above fair market value and that the trade-ins were auctioned to dealers for *whatever price* they would bring. These italicized words could represent concepts appearing at any point along a potentially infinite continuum, from two or three to tens of thousands of down payments, from a dollar and a half above fair market value to thousands over that value. Did these practices occur at one or two perhaps maverick dealerships, or were they a Urcarco-wide practice? Although Plaintiffs might posit that everyone at Urcarco, and all in the legion of defendants, engaged in a course of wrongful conduct, they offer no facts to buttress their conclusions. Perhaps more telling were Plaintiffs' counsel's answers to the Court's questions at the hearing held on March 30. When asked direct questions about the allegedly factual paragraphs eighty-six through eighty-nine, counsel repeatedly invoked the phrase "our investigation revealed" and then made the complaint's conclusions the object of that hollow phrase. The Court is persuaded that if Plaintiffs knew of facts to support their causes of action, those facts would have been trumpeted in response to the Court's not so subtle concern with the complaint's dearth of factual specificity, which concern was communicated at length at the hearing.

Another concern of paragraph eighty-seven is as follows: "Because URCARCO sold

---

7. *Cf. In re First Chicago Corp. Sec. Litig.,* 769 F.Supp. 1444, 1453 (N.D.Ill.1991): "[I]f a plaintiff needed only to quote statements from a corporation's annual report and alleged that those statements were misrepresentations, anyone with a copy of a corporation's reports who was willing to pay the court filing fee could sustain a complaint of securities fraud against any corporation with declining fortunes."

late-model cars at higher prices, financed them for longer periods of time, and required a far smaller down payment than most sellers of used cars, its risks of collection are materially greater." This is nothing but an unsupported conclusion. Along the same lines, this sentence: "The Company, instead of achieving reduced costs in the acquisition of used car inventory, overpaid suppliers in an effort to corner the market." What suppliers, where, when? Overpaid by whose standards, and what *facts* remotely suggest the conclusion that Urcarco was trying to "corner the market"? The paragraph contains more language, but all in the same conclusory vein.

Paragraph eighty-eight bemoans Urcarco's reserve for losses being about half of that recorded by other used car dealers and Urcarco's penchant for selling cars to customers who were "unable or unwilling to repay car loans," which "further and materially increas[ed] URCARCO's losses." At best, this paragraph amounts to management by hindsight, but once again, suffers from the same who-what-when-where-how deficiency as the other allegedly fact laden paragraphs.

Paragraph eighty-nine deals with the IPO and SPO prospectuses and the 1990 Annual Report and Form 10–K. It states that these instruments "contained misrepresentations of material facts and omitted to state facts necessary to make the statements therein not misleading, in, among others, the following respects:" These are among the given examples:

> (v) reports of down payments received were falsely inflated because of its practice of recognizing the full down payment at the time of sale while permitting cash portions to be paid out in weekly "bumps" which it knew often were not paid by customers; and (vi) manipulation of charge-offs and reserve levels as reported on the Company's balance sheet and income statement.

One wonders of this practice, how often and how widespread? How often were weekly "bumps" not paid, and what is the factual basis regarding Urcarco's knowledge of both the practice and the nonpayment? What sort of manipulation, how often, how widespread, who manipulated?

■ The foregoing discussion applies to all of Plaintiff's claims except that for negligent misrepresentation. However, Plaintiff's causes of action having scienter as an element, the 10b–5 claim for instance, are additionally deficient for the complaint's failure to plead sufficient facts giving rise to a strong inference of that requisite intent. *See, e.g., Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991). The Supreme Court defined "scienter" as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The lower federal courts have uniformly held that recklessness is sufficient to satisfy the scienter requirement, although they are not uniform regarding the correct construction of the term "recklessness." *See generally* Marc I. Steinberg and Samuel H. Gruenbaum, *Variations of Recklessness After Hochfelder and Aaron,* 8 Sec.Reg.L.J. 179 (1980). The Fifth Circuit has defined its standard as "severe recklessness," and has glossed this phrase as follows:

> [It is] limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). The court reaffirmed this perspective as recently as 1992. *See Akin v. Q–L Invs., Inc.,* 959 F.2d 521, 526 n. 2 (5th Cir. 1992).

Judged against the foregoing standards, Plaintiffs' pleading falters. Their allegations regarding intent range from conclusory to conclusory and fanciful. The complaint's usual practice is simply to state that the defendants knowingly did this or recklessly disregarded that. More particularized allegations state that the underwriter defendants agreed to participate in the grandiose

scheme that plaintiffs imagine in order "to obtain substantial fees, expenses and discounts in connection with the Offerings." (Am.Compl. at ¶ 19). Coopers & Lybrand agreed to go along with the alleged wrongdoing so that it could achieve or maintain a variety of benefits:

(i) protect and enhance the substantial auditing and other fees received from UR-CARCO; (ii) maintain and increase its market share for auditing and accounting services to be performed and thereby increase the prestige and compensation of the Coopers and Lybrand partners responsible for the URCARCO engagement; (iii) increase the income received by the Coopers and Lybrand partners responsible for the URCARCO engagement since their income was directly tied to retaining engagements such as URCARCO; and (iv) maintain its competitive position as to other large accounting firms by retaining UR-CARCO as a client.

(*Id.* at ¶ 21). Plaintiffs sing a similar "They did it for the Money" chorus about the individual defendants.

These statements concerning the defendants' states of mind do not rest on any other basis than Plaintiffs' bald assertions of their truth. To allow a plaintiff to file a securities fraud action based on a security's market decline and then accept "they did it for the money" as a sufficient explanation to put a defendant on notice of his alleged scienter would be to endorse a nihilistic approach to Rule 9(b) jurisprudence; it would pare the pleading requirement for state of mind down to nothingness.

Plaintiffs' segregation of the individual defendants, Coopers and the underwriter defendants for the complaint's attempt at alleging state of mind is unusual for the pleading as a whole. For the most part, the defendants—thirteen named defendants, three of which are supposed to represent a defendant class of fifty firms—are referred to simply as "defendants." Such general allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b). *Unimobil 84, Inc. v. Spurney,* 797 F.2d 214, 217 (5th Cir.

1986); *Tuchman v. DSC Communications Corp.,* 818 F.Supp. 971 (N.D.Tex.1993).

Plaintiffs' twelve-gauge class action complaint fails to put the defendants on notice of what their alleged wrongful conduct was, puts the defendants' reputations at risk of unfounded allegations and threatens the judicial system with a potential strike suit. Parsing the complaint and comparing the results with the applicable law have convinced the Court so. Yet equally convincing is the fact that Plaintiffs' lead counsel could offer nothing substantive in response to the Court's queries regarding its perception that the complaint's factual particularity was bankrupt.

At the hearing, Defendants' counsel reurged their motions to dismiss for failure to state fraud with particularity. Plaintiffs' counsel knew exactly what was at stake, yet could offer nothing to allay the Court's concerns. Because Plaintiffs have repleaded twice and because they were given the opportunity to explain the complaint's deficiency at the hearing but could not, the Court determines that they should not be afforded yet another opportunity to replead. For the foregoing reasons, Defendants' motions are hereby **GRANTED**. Plaintiffs' complaint, except for the counts regarding negligent misrepresentation and alleged violations of Section 27.01 of the Texas Business & Commerce Code concerning fraud in a stock transaction, is hereby **DISMISSED** with prejudice. Plaintiffs' causes of action for negligent misrepresentation and alleged violations of Section 27.01 are hereby **DISMISSED** for want of jurisdiction.

**SO ORDERED.**