Muriel SIEBERT and Stanley Kleckner, on behalf of themselves and all other shareholders similarly situated

v.

Fred NIVES, Joseph V. Ciaburri, Michael M. Ciaburri, William B. Laudano, Jr., Gary M. Beach, and Amity Bankcorp, Inc.

No. 5:92–CV–367 (JAC).

United States District Court, D. Connecticut.

Oct. 3, 1994.

**112**

Samuel P. Sporn, Schoengold & Sporn, P.C., New York City and Gary MacMillan, Whitman & Ransom, Greenwich, CT, for plaintiffs.

Sharon S. Tisher and Rhoda L. Rudnick, Day, Berry & Howard, Hartford, CT, for defendants Amity Bankcorp Inc., Joseph V. Ciaburri, Michael M. Ciaburri, William B. Laudano, and Gary M. Beach.

Carter LaPrade, Tyler, Cooper & Alcorn, New Haven, CT, for defendant Fred Nives.

### RULING ON MOTION TO DISMISS

JOSÉ A. CABRANES, Circuit Judge.*

This action was brought by shareholders of defendant Amity Bankcorp, Inc. ("Amity") to block a stock purchase agreement between the defendant corporation and a third party. Pending before the court is the defendants' motion to dismiss the amended complaint.

### BACKGROUND

The parties do not dispute the following facts. Amity is a Connecticut bank holding company that owns all the outstanding stock of Amity Bank, a commercial bank serving various Connecticut cities. The individual defendants were affiliated with Amity during all relevant periods. At the time the complaint was filed, Fred Nives was Chairman of Amity Bank's Board of Directors and owned 32.9% of Amity's outstanding stock; Joseph V. Ciaburri was President and Chief Executive Officer as well as a director of Amity and Amity Bank; Michael M. Ciaburri was a member of Amity Bank's senior management and was principally responsible for its commercial lending activities; William B. Laudano, Jr. was Amity Bank's Vice President and Chief Financial Officer; and Gary M. Beach was Vice President of Amity Bank and was responsible for the bank's commercial lending activities.

In the spring of 1992, the directors of Amity entered into a Stock Purchase Agreement with Rudolf W. Lenz. Pursuant to this agreement ("the Lenz Agreement"), Lenz was to acquire an 80% interest in the corporation in exchange for a $5 million capital investment. The directors intended to seek shareholder approval of the Lenz Agreement at Amity's annual meeting on June 26, 1992. Toward that end, the directors disseminated proxy material concerning the fairness of the Lenz offer.

On June 23, 1992, the plaintiffs commenced this action to enjoin the annual meeting, alleging that the proxy statements which the directors had disseminated were misleading, in violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* ("1934 Act"). The plaintiffs also alleged mismanagement related to the quality of Amity's loan portfolio, breach of fiduciary duty, and self-dealing.

After a hearing on June 25, 1992, the court denied the plaintiffs' request for a temporary restraining order. The defendants filed a motion to dismiss the complaint on July 8, 1992, which was withdrawn on August 19, 1992, after the plaintiffs agreed to amend their complaint.

The Amended Complaint (filed Aug. 7, 1992) ("Complaint") comprises two class actions. First, the Complaint asserts a class action on behalf of all Amity shareholders

---

\* Of the United States Court of Appeals for the    Second Circuit, sitting by designation.

who purchased stock between May 16, 1990 and March 31, 1992 (the "Loan Loss Class"). In connection with the first action, the plaintiffs allege that the defendants violated §§ 10(b) and 20(b) of the 1934 Act by artificially inflating Amity's stock price by making misrepresentations and omissions in the corporation's public filings, press releases and news articles. Second, the Complaint asserts a class action on behalf of all owners of Amity stock as of May 1, 1992 (the "Proxy Class"). With respect to the second action, the plaintiffs allege that defendants violated § 14(a) of the 1934 Act by making material misrepresentations and omissions in Amity's May 8, 1992 Proxy Statement and June 11, 1992 Supplemental Proxy Disclosure. Finally, the Complaint contains supplemental state law claims for common law fraud and negligent misrepresentation.

## DISCUSSION

In deciding a motion to dismiss, the court must accept as true all factual allegations in the complaint and draw inferences from these allegations in the light most favorable to the plaintiffs. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint, or portions thereof, will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### I.

The first question presented is whether the plaintiffs' first and second counts—pursu-

1. Section 10(b) of the 1934 Act prohibits fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Section 10(b) provides:

   It shall be unlawful for any.person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission

ant to sections 10(b)[1] and 20(a)[2] of the 1934 Act, respectively—are barred by the applicable statute of limitations. The parties agree that the relevant limitations period is the "one-year/three-year" rule provided in section 9(e) of the 1934 Act. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (adopting statute of limitations provided in section 9(e) for section 10(b) claims); *Ceres Partners v. GEL Associates,* 918 F.2d 349 (2d Cir.1990) (same). The "one-year/three-year" rule provides in pertinent part that

> [n]o action shall be maintained to enforce any liability created under this section, unless brought within *one year after the discovery* of the facts constituting the violation and within *three years after such violation.*

15 U.S.C. § 78i(e) (emphases added). The only question regarding the application of this rule is whether the one-year prong is triggered by "inquiry notice" of the fraud or whether actual notice is required. The defendants argue that "inquiry notice" is sufficient, while the plaintiffs maintain that the statute of limitations does not begin to run until a plaintiff receives actual notice of the facts constituting the violation.

It is well settled in this Circuit that the one-year discovery provision of section 9(e) "includes constructive and inquiry notice as well as actual notice." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (1993) (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). As our Court of Appeals has stated,

   may prescribe as necessary or appropriate in the public interest or for the protection of investors.
   15 U.S.C. § 78j(b).

2. Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or causes of action." 15 U.S.C. § 78t(a).

[a] plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.... Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.... Such circumstances are often analogized to "storm warnings."

*Id.*

■ Because the issue of inquiry notice is determined by an objective standard—that is, whether an investor of ordinary intelligence would have discovered the fraud—the court may resolve it as a matter of law on a motion to dismiss. *See id.* To this end, the court may consider certain documents outside the pleadings that the plaintiffs had in their possession or had knowledge of and relied upon in bringing suit. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied sub nom. Cortec. Industries v. Westinghouse Credit Corp.*, —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (holding that district court may consider stock purchase agreement, offering memorandum, and warrant, on a motion to dismiss, even though these material were not attached to the complaint).

■ In the instant case, the defendants argue that Amity's 1990 Annual Report apprised the plaintiffs that something was "amiss" at the corporation as early as April 1991, when the report was distributed to the shareholders and filed with the Securities and Exchange Commission ("SEC"). *See* Defendants' Memorandum of Law in Support of Motion to Dismiss (filed Oct. 26, 1992) at 14. The defendants contend that the plain-

tiffs were put on inquiry notice by the negative financial data contained in the Annual Report, including the $2.6 million loss in 1990, compared to a $1.5 million profit in 1989; the $6.3 million loan loss reserve in 1990, compared to a $2.3 million reserve in 1989; a $17.5 million of nonperforming assets in 1990, compared to the $4.7 million figure in 1989; and the low price at which the company's stock was trading by the end of 1989. *See* Amity Bancorp, Inc. 1990 Annual Report, attached as Exhibit C to Affidavit of Rosemarie A. Romano (filed Oct. 26, 1992) ("1990 Annual Report") at 2, 10.[3]

The plaintiffs argue that while the 1990 Annual Report may have informed them that 1990 had been a difficult year for Amity, the report did not put them on notice of potential fraud. In fact, the plaintiffs contend, the 1990 Annual Report contained statements intended to give shareholders comfort that Amity was improving its procedures for reserving against bad loans and that its reserves were adequate. According to the plaintiffs, it was not until Amity disclosed—on or about July 30, 1991—that the FDIC had required it to increase its allowance for loan and lease losses by $2.5 million, that they should have known something was "amiss," and that Amity's prior statements concerning the adequacy of its loan reserves were untrue.

The court finds that nothing in the 1990 Annual Report put the plaintiffs on notice of fraud. The Annual Report merely disclosed that Amity was having an uncharacteristically bad year. It surely cannot be the case that every annual report which records corporate losses signals some underlying fraud. While decreased profits and increased loan loss reserves may be consistent with fraud in some cases, they are also symptomatic of a variety of non-fraudulent ills, ranging from poor business judgment to unfavorable mar-

---

**3.** The defendants also point to written statements made by plaintiff Siebert in April and May 1991, which, they assert, indicate that she was aware of the alleged fraud more than fifteen months before she filed her complaint. Siebert claims that her letters are irrelevant to the claims on which the defendants have offered them because those claims belong to the Loan Loss Class of which she is not a member.

The court need not resolve this dispute because, with the limited exception discussed above, it is well settled that a district court may not consider materials outside of the pleadings on a motion to dismiss. *See Cortec Industries,* 949 F.2d at 47 (holding that affidavits, depositions, or other extraneous documents convert Rule 12(b)(6) motion into Rule 56 motion for summary judgment).

ket conditions. Indeed, the Annual Report refers to "deterioration in the northeast and Connecticut economies" and states that the "industry's turnaround will be predicated on the upturn of the economy with the real estate industry being only one of the many factors of consideration." 1990 Annual Report at 2. The report also contains other reassurances that would serve to calm shareholders' suspicions that something might be "amiss," including statements which reassure investors that the loss reserves were "adequate" and that lending practices were "conservative." *See* 1990 Annual Report at 20.

Thus, this case can be distinguished from cases in which the public documents upon which the plaintiffs relied in bringing their claims contained sufficient "storm warnings" of fraud. For example, in *In re General Development Corp. Bond Litig.*, 800 F.Supp. 1128 (S.D.N.Y.1992)—a case drawn to the court's attention by the defendants—the plaintiffs alleged that the defendants misrepresented the competitive advantage and business acumen of General Development Corp. ("GDC"), failed to disclose the nature of pending litigation, failed to take reserves against potential litigation awards, and failed to disclose the company's financial obligations. The court dismissed the complaint as untimely because GDC's public filings disclosed the pending litigation against the corporation and revealed that the Federal Trade Commission and state agencies had begun to investigate the corporation. Based on these filings, the court found "beyond cavil that no reasonable adult reader ... could have remained in ignorance of the likelihood that something was severely amiss at GDC." *Id.* at 1142.

In *Dodds v. Cigna Securities, Inc., supra*, the plaintiff alleged that the defendant, in order to make higher commissions, induced her to invest in limited partnerships that were unsuitable for her because of their risk and illiquidity. The district court dismissed her complaint as untimely. The Court of Appeals affirmed, reasoning that the risk disclosure language contained in the prospectuses for the limited partnerships and the disclosure form which the plaintiff had signed "were sufficient to put a reasonable investor of ordinary intelligence on notice of the commissions, the risk, and the illiquidity of these investments." 12 F.3d at 351.

In the instant case, Amity's 1990 Annual Report contains no warnings that the loan loss reserves were understated or that Amity was engaging in unsound lending practices. To the contrary, the 1990 Annual Report states that Amity's loan reserves were "adequate" and that its lending practices were "conservative." *See* 1990 Annual Report at 20. Furthermore, the annual report makes no disclosure of pending litigation. While it does state that the FDIC had begun to investigate the corporation, it also assures investors that Amity had already revised its loan policy to address the FDIC's concerns and had begun to revise its methodology for determining the allowance for loan losses. *See* 1990 Annual Report at 16. In addition, the 1990 Annual Report states that periodic review by federal and state banking agencies is routine in the banking industry. *See id.* at 20. Therefore, it was not "beyond cavil" (or to be expected) that a reasonable investor would have suspected that something was severely "amiss" at Amity based on the 1990 Annual Report.

The instant case can also be distinguished from cases in which shareholders brought suit alleging securities fraud within days of the corporation's announcement that it was increasing its loan loss reserves. In *Steiner v. Shawmut Nat. Corp.*, 766 F.Supp. 1236 (D.Conn.1991), the defendant corporation made an unexpected announcement increasing loan loss reserves over the figure previously reported for that year. The plaintiffs filed suit two days later. In *Ferber v. Travelers Corp.*, 785 F.Supp. 1101 (D.Conn.1991), the defendant corporation made an announcement increasing loan loss reserves over the figure reported for the previous year. The plaintiffs filed suit four days later. While neither of these cases involved a statute of limitations issue, the defendants in the instant case assert that they stand for the proposition that an increase in loan loss reserves should instantly trigger shareholder suspicion. The court disagrees.

In *Steiner*, only two months had elapsed between the first and second announcements

**116**

concerning loan loss reserves. *See* 766 F.Supp. at 1239 (first announcement on January 23, 1990, second announcement on March 21, 1990). By contrast, in the instant case, Amity announced an increase in loan loss reserves over the number reported *for the previous year.* Such an announcement of an increase, occurring in the normal course, may be attributable to forces other than fraud. Therefore, the announcement of such an increase may not have had the same effect on shareholders as the announcement in *Steiner,* where the timing of the announcements provided grounds for believing that something was "amiss."

In *Ferber,* the plaintiffs filed suit only four days after an October 5, 1990 announcement of an increase in loan loss reserves. The plaintiffs, however, alleged fraud stemming back to public statements and reports made on November 15, 1989. For this reason, the *Ferber* court referred to the October 5 announcement as the "culmination" of the defendants' allegedly false representations concerning loan loss reserves. *See Ferber,* 785 F.Supp. at 1105. It is far from clear that the plaintiffs in *Ferber* filed suit as soon as they suspected something was amiss; rather, it appears that they waited nearly a year after discovering the alleged fraud—that is, virtually the entire period allowed by the statute of limitations. Therefore, this case does not support the defendants' position that an increase in loan loss reserves should automatically provoke shareholder suspicion.

It is important to note that while the Court of Appeals has held that inquiry notice may be determined as a matter of law on a motion to dismiss, not every case will be susceptible to such a determination. *See Vassilatos v. Ceram Tech Int'l,* 1993 WL 177780, at *4–5, 1993 U.S.Dist. LEXIS, at *14 (S.D.N.Y. May 19, 1993) (stating that after discovery, parties and court will be in a better position to ascertain the point in time at which the plaintiffs discovered the fraud). In the instant case, the court cannot conclude as a matter of law that Amity's April 1991 public filings

would have put reasonable investors on notice of the possibility of fraud. Accordingly, the defendants' motion to dismiss the plaintiffs' first and second counts as time-barred must be denied.

## II.

The next question presented is whether count one and count two satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). The defendants contend that counts one and two fail to meet this standard. The court disagrees.

■■■■ To satisfy the requirements of Rule 9(b), a complaint must "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify the persons responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (citing *Goldman v. Belden,* 754 F.2d 1059, 1069–70 (2d Cir.1985)).[4]

■■■■ With respect to claims pursuant to section 10(b), the complaint should, at a minimum, state the time, place, speaker, and content of the alleged misrepresentations or omissions. *Id.* (citing *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986)). In addition, in order to adequately plead scienter, the complaint must "allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas v. Hassett,* 886 F.2d at 12–13 (citing *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc)).

■■■■ The defendants argue that the plaintiffs have failed to satisfy the requirements

---

4. Where defendants are "insiders," the complaint need not allege a specific connection between fraudulent representations in an annual report or filing with the SEC and the particular defendants. *See DiVittorio v. Equidyne Extractive*

*Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987) (holding that no specific connection between fraudulent representations in an Offering Memorandum and particular defendants is necessary where defendants are insiders).

of Rule 9(b), relying primarily on *Denny v. Barber*, 576 F.2d 465 (2d Cir.1978). In *Denny*, the Court of Appeals affirmed the dismissal of a complaint under Rule 9(b). The plaintiffs in that case did not identify which statements were allegedly knowingly false; claimed that a number of the defendant's investment activities (without identifying specific transactions) were "speculative and risky"; and argued that these speculative and risky operations should have been disclosed at an earlier time. *Id.* at 469–470. Characterizing the plaintiffs' allegations as a classic "example of fraud by hindsight," the Court ordered the dismissal of the complaint. *Id.* at 470.

The defendants in the instant case contend that the *Denny* complaint is "essentially indistinguishable" from that of the plaintiffs. Memorandum Of Law In Support Of Defendants' Motion To Dismiss (filed October 26, 1992) at 21. The court, however, finds otherwise. Unlike the complaint in *Denny*, the Complaint here alleges the time, place, and content of the alleged misrepresentations. Indeed, it cites specific statements from the 1989 Annual Report, the 1990 and 1991 SEC Form 10–Q filings, and the 1990 SEC Form 10–K. *See* Complaint at ¶¶ 25–43. Moreover, the plaintiffs' allegations here amount to more than fraud by hindsight. The plaintiffs allege that Amity made statements, incorporated in SEC documents in 1990 and 1991, that its lending policies were "conservative" and its loan loss reserves "adequate;" that during the relevant time period Amity had an increasingly high percentage of commercial loans in Amity's portfolio, and its allowances for loan losses constituted a very small percentage of loans outstanding; that Amity disclosed in its July 1991 SEC Form 8–K that it had increased its allowances for loan and lease losses by more than 146% in response to an FDIC Order; that Amity disclosed in its Report on SEC Form 10–K for the 1991 year that it had increased its provision for loan losses by 328% at the direction of the FDIC; and, finally, that Amity disclosed in its July 1991 SEC 8–K form its consent to an FDIC 1991 order that it cease and desist from, *inter alia*, engaging in hazardous lending and lax collection practices, operating with an inadequate allowance

for loan and lease losses for the volume, kind and quality of loans held, and engaging in violations of applicable laws and regulations. *See* Complaint at ¶¶ 29, 30, 38, 39, 43.

By juxtaposing Amity's statements about its lending policy with specific facts about that policy and other developments which undermine the credibility of those statements, the plaintiffs have alleged not only that the defendants may have made some mistakes, but also that the defendants knowingly or recklessly misrepresented their lending policy. In doing so, the plaintiffs adequately have alleged "the manner in which the statements or omissions were false and misleading." *In re Meridian Sec. Litig.*, 772 F.Supp. 223, 230 (E.D.Pa.1991) (declining to dismiss complaint alleging that defendant had misrepresented quality of its loan portfolio, overstated its earnings by understating its loan loss reserves, and made false projections about future earnings). Furthermore, the foregoing allegations give Amity "fair notice" of how the plaintiffs believe they were defrauded. *See Steiner v. Shawmut Nat. Corp.*, 766 F.Supp. 1236, 1242 (D.Conn. 1991) ("What Rule 9(b) requires, in short, is a pleading that gives fair notice in light of the special nature of fraud cases.").

Because the complaint alleges specific facts that support an inference of fraud, this case can also be distinguished from decisions by judges in this District in *Ferber v. Travelers Corp.*, 785 F.Supp. 1101 (D.Conn.1991) (Nevas, J.), *Steiner*, 766 F.Supp. 1236 (Nevas, J.), and *Salit v. Centerbank*, 767 F.Supp. 429 (D.Conn.1990) (Burns, J.), all of which dismissed complaints for failure to plead fraud with particularity.

The defendants will be free to argue at a later stage in the litigation about their possible differences of opinion with the FDIC, about the timing of various statements and their financial troubles, and about whether Amity did indeed have "good internal controls," see Complaint at ¶¶ 27, 31. The court believes, however, that at this juncture, the plaintiffs have provided a sufficient factual basis for its allegations of fraud to defeat a motion to dismiss on Rule 9(b) grounds. The plaintiffs do not merely allege that Amity

failed to disclose inadequacies in its lending policy, but, that Amity also made statements characterizing such policy as "conservative" and its loan loss reserves as "adequate." According to the Third Circuit, Amity has thereby brought the subject of its management practices "in[to] play" under the securities laws. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). The *Shapiro* court reasoned, "if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations." *Id.* at 282. *See also Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1094, 111 S.Ct. 2749, 2759, 115 L.Ed.2d 929 (1991) ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading").

■ In further support of their motion, the defendants argue that the plaintiffs have failed to allege the requisite scienter. Under Rule 9(b), the plaintiffs must allege facts which lead to a "strong inference" that there was fraud, or, alternatively, must show a credible motive for committing fraud. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989). In the instant case, the defendants have alleged facts from which a credible motive for committing fraud may be inferred. As corporate insiders, these defendants arguably had an interest in keeping the stock price at an artificially inflated level in order to protect their positions and compensation. Accordingly, the defendants' motion to dismiss on Rule 9(b) grounds is denied.

### III.

The third question presented is whether the plaintiffs' fourth count—a claim under section 14(a) of the 1934 Act—states a claim upon which relief can be granted. Section 14(a) prohibits the solicitation of proxies in violation of the rules and regulations promulgated under the 1934 Act.[5] The defendants argue that the plaintiffs' fourth count fails to state a claim under section 14(a) because no proxy solicitation was legally required with respect to the Lenz Agreement. The plaintiffs respond that the proxy solicitation was required, and therefore, that they have stated a claim under section 14(a).

■ In order to state a claim under section 14(a), the proxy solicitation at issue must be an "essential link" in the transaction alleged to have caused the plaintiffs' damages. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970). The Supreme Court has held that no such causal relationship exists where a proxy solicitation was not legally required, but instead was made voluntarily by the directors in order to increase shareholders' goodwill. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1105, 111 S.Ct. 2749, 2765, 115 L.Ed.2d 929 (1991). If it were otherwise, the *Virginia Bankshares* Court observed, "[c]ausation would turn on inferences about what corporate directors would have thought and done without the minority shareholder approval unneeded to authorize action." *Id.* at 1105, 111 S.Ct. at 2765.

■ It is not the case, however, that *Virginia Bankshares* forecloses the plaintiff's claim under section 14(a) simply because the proxy solicitation for the Lenz Agreement was not required by law or corporate bylaw. *See id.* at 1098–1108, 111 S.Ct. at 2761–2766. To the contrary, the plaintiffs have alleged sufficient causation. The defendants concede that Connecticut law required a vote of the majority of the shareholders in order to amend Amity's Certificate of Incorporation to increase the amount of authorized common stock. *See* Defendants' Reply Memorandum ("Reply Memorandum") at 35; Exhibit H to

5. Section 14(a) provides that
   [i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

June 24, 1992 Affidavit of Joseph V. Ciaburri, at 9; 33 Conn.Gen.Stat. § 360(c). And it is undisputed that this amendment was essential to the success of the Lenz Agreement. *See* Reply Memorandum at 37. That the plaintiffs' allegations of misstatements relate specifically to the Lenz Agreement, not to the authorization of additional shares, is not dispositive. Indeed, the defendants needed to discuss the merits of the Lenz Agreement in order to induce shareholders to approve the authorization of additional shares. In the court's view, because the Lenz Agreement depended on an authorization of additional shares—which, in turn, required a vote by a majority of shareholders—the proxy solicitation constitutes an "essential link" in the transaction alleged to have caused the plaintiffs' damages, the Lenz Agreement. Assuming the plaintiffs' allegations are true, the misrepresentations in the proxy materials—while perhaps relating specifically only to the Lenz Agreement—clearly were designed to convince the shareholders not only to approve the Lenz Agreement, but also to consent to the authorization of additional shares.

The defendants argue that the chain of causation was broken by the shareholders' ability to approve the authorization of additional shares without approving the Lenz Agreement. The court, however, will not artificially separate what appears on the face of the Complaint to be two closely entwined events. The fact is, the Lenz Agreement *did* require a proxy solicitation—on the crucial issue of an authorization of additional shares, without which that agreement was unworkable. Accordingly, the defendants' motion to dismiss the plaintiffs claim under section 14(a) is denied.

### IV.

Finally, the defendants argue that the plaintiffs' supplemental state law claims of fraud and negligent misrepresentation should be dismissed for lack of subject matter jurisdiction. Inasmuch as the plaintiffs' federal claims have survived the defendants' motion to dismiss, the court need not consider dismissal of the state law claims. *See* 28 U.S.C. § 1367(a).

## CONCLUSION

Based on the record, and for the reasons stated above, the defendants' Motion To Dismiss (doc. # 67) is hereby DENIED.

It is so ordered.